BATCHELDER and another v. INSURANCE CO. OF NORTH AMERICA.[1]

(District Court, E. D. Pennsylvania. April 1, 1887.)

1. INSURANCE—MARINE—SEAWORTHINESS OF VESSEL—BURDEN OF PROOF.

Ordinarily the burden of proving that a vessel was unseaworthy at the time an insurance on the cargo was effected is on the insurer; but where a vessel has been forced to put back into port by a storm, and an insurance is then effected, and the voyage resumed without notice to the insurers of the storm, the burden is shifted, and the insured must show that the vessel was seaworthy when she made the second start.

2. SAME—SURVEYORS' REPORT.

Unless overcome by competent evidence, the report of the surveyors of a port is sufficient evidence that a vessel is seaworthy.

3. SAME—LOSS BEFORE AND AFTER INSURANCE.

When part of the damage to a cargo was sustained prior to the placing of the insurance, and no notice of such damage given to the insurers, the duty of ascertaining what part of the loss occurred before and what after the insurance devolves on the insured.

In Admiralty.

*Driver & Coulston*, for libelants.

*Charles Gibbons, Jr.*, for respondent.

BUTLER, J. The libelants, lumber merchants at Norfolk, Virginia, chartered the barge Americus in February, 1884, to carry a cargo of lumber from their landing below Norfolk, to Philadelphia. Soon after, the barge took on about 200,000 feet, and proceeded to Norfolk. On the eighteenth of the same month she started up the bay in tow of the tug Monitor. During the night of the eighteenth, while the barge and tug were lying at anchor near Hampton bar, below Fortress Monroe, a heavy gale arose, which continued during the next day and night, and about 9 o'clock P. M. of the nineteenth, caused both vessels to drag and ground upon the beach. The barge remained there for three days, and was then taken off by wreckers, (who first removed the deck load,) and conveyed to Norfolk, where she remained for several days. She had taken in some 18 inches of water as she lay on the beach, which was pumped out. While at Norfolk a survey was made, and she was reported tight and safe for her contemplated voyage. On the twenty-seventh of February she again left Norfolk, in tow of the tug Rattler, and proceeded up the bay. After being out for several hours, she encountered another severe storm, which caused her to roll and pitch dangerously. After passing the Horse-shoe bar she leaked badly, and was in such condition as to make it necessary to enter the York river for harbor, where she came to anchor about midnight. The storm continued during that night, and the next day and night. She filled with water soon after the leak was discovered, and a part of the deck load was washed off and lost. After the storm abated she was taken to the Pian-

[1] Reported by C. Berkeley Taylor, Esq., of the Philadelphia bar.

katank river, and beached. Another barge was obtained, and the lumber taken by it to Philadelphia. After the Americus had been towed to Baltimore, it was ascertained that she had a hole under her bilge, apparently made by striking against some hidden obstruction. The lumber, when delivered, (saving what had been on deck,) was wet, mildewed, and stained. Previously, on the twenty-seventh of February, Batchelder and Collins had effected insurance on the lumber in the sum of $2,000, with the respondent. When the insurance was effected the company was not informed of the first storm, and grounding of the barge or wetting of the cargo.

The defense set up to the claim under the policy is two-fold: *First*, that the barge was unseaworthy; and, *second*, that important facts were suppressed.

As respects the first, it must be conceded, I think, that the burden of proof is on the libelants. Ordinarily, in such an issue, this is otherwise. But the facts stated in the libel respecting the first storm, and grounding of the vessel, are sufficient to shift the burden. In the absence of evidence to the contrary, I think it must be presumed that the consequences of this storm and grounding would render the vessel temporarily unseaworthy. The libelants' counsel seem to have entertained this view, and prepared themselves to meet it, by producing testimony to the vessel's condition when she left Norfolk the second time. As we have seen, the surveyors reported her in good condition. If this report was unattacked it would be conclusive. It is not attacked by direct testimony that it is untrue. It is, however, severely criticised; the survey is said to have been carelessly made, with little or no examination; and it is urged that, in view of the grounding, and the severe strain to which the barge was subjected during the first storm, it is not reasonable to believe that she escaped serious injury; and therefore that the surveyors' report is entitled to little or no weight; especially in view of the manner in which the survey was made. This was urged with much earnestness and ability, and I have deemed it worthy of serious consideration. It seems to me that the survey was not as full and minute as it might, and probably should, have been. Still, however, the surveyors, who were disinterested, experienced, and competent, considered it sufficient to warrant the judgment they expressed; and those who had it made were interested to see that it was sufficiently thorough. I attach no weight to the circumstance that one of the surveyors is an agent of the respondents. At the time of this survey the respondents had no interest involved, and in assisting to make it he in no respect represented them.

There are other facts bearing on the question under consideration, of great significance. The filling of the barge during the second storm, and the beaching which became necessary, resulted from the hole in her side, under the bilge. This is entirely clear. If the hole was made during the second storm, it settles the question against the respondents. If made during the first, it settles the question the other way. It is evident that this hole did not exist when the barge left Norfolk the second time. If it had been made during the first storm, or when she was aground, near

Fortress Monroe, she would have immediately filled with water. As the libelants' witnesses say, she could not have run the distance of her length with such a hole, without filling. Yet she was taken back to Norfolk, where she laid for several days, without exhibiting any material leakage. Of course, as she lay upon the bottom near Fortress Monroe, her seams would open slightly, and some water be taken in. The comparatively small quantity she took in, can thus be accounted for. When she left Norfolk again, and as she passed up the bay, she did not leak materially, if at all. It must be concluded, therefore, that the hole did not exist at that time. It cannot be supposed that the planks at this part had been previously so injured as to render them unsafe, and thus lead to the disaster which followed. The hole was evidently made by striking against some obstruction under water. It would be unreasonable to believe that she struck at this point against such an object, during each storm, and that, though rendered unsafe by the first blow, the hole was not actually made or completed until the second. I esteem it quite clear that some such obstruction was encountered during the second storm, possibly in passing the Horse-shoe bar, and that the injury was thus inflicted. As the hole is the only cause or evidence of the vessel's unseaworthiness at the time she filled and was beached, it must be concluded that she was seaworthy when she left Norfolk, and up to the time it was made.

As respects the second question, I find no evidence of the suppression of any fact material to the contract of insurance. The insurers were not aware of the first grounding of the vessel. This, however, is unimportant. They did not insure *her*. The libelants were not called upon to make any statement respecting the vessel in which their cargo was to be carried. They warranted her seaworthy. The entire responsibility respecting her condition was upon them. No matter what they might represent or withhold, if the vessel was not seaworthy, the insurers were relieved, and the insured lost the benefit of their policy. Having this guaranty, the insurers had no interest in the vessel calling for information. They were not informed, either, that the cargo had been wet. This also seems to be unimportant. The policy covers future risk simply; and the respondents are bound, therefore, only for such future loss as can be proved. I do not think the rules of law governing cases where there is suppression of material facts, have any application here. Nothing was suppressed respecting the risk assumed,—future injury to or loss of the cargo. The previous wetting could have no influence on this.

What extent of injury was sustained to the cargo after the date of the policy is not shown, and the subject must go to a commissioner. Some part of the lumber was washed off, and thus lost. The remainder was wet, and became mildewed and stained. How much the injury is due to the second wetting, it may possibly be difficult to ascertain. The libelants must, however, ascertain it with reasonable certainty, or be denied this part of their claim. Under the circumstances, the burden of distinguishing between the consequences of the two occasions when the lumber was wet, is upon them. I have not alluded to the towage of a raft

astern, as this method of making up a tow in such navigation is usual, and therefore is unimportant to the case.

A decree must be entered sustaining the libel.