## KAHMANN & McMURRY v. ÆTNA INS. CO. OF HARTFORD, CONN.

(Circuit Court of Appeals, Fifth Circuit. March 29, 1917. Rehearing Denied April 28, 1917.)

No. 2993.

1. INSURANCE ⬅481—MARINE INSURANCE—CONSTRUCTIVE TOTAL LOSS.

Whatever may constitute a constructive total loss under the terms of a marine policy, it is not incumbent upon the insured to raise and dock a vessel and have her repaired, in order to ascertain whether or not the repairs will cost the per cent. of her agreed value named in the policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1259–1261.]

2. INSURANCE ⬅484—EXTENT OF LOSS AND LIABILITY OF INSURER—MARINE INSURANCE.

A policy of insurance on a tug provided that in case of a loss the insured use every effort to safeguard, recover, and repair the vessel, and that if they did not the insurer might cause it to be recovered and repaired for the account of the insured, contributing its own part of the expense. The tug struck an obstruction and was sunk, resting on some stumps, which caused further injury by straining and twisting. A surveyor employed by the owners reported that the vessel was not worth repairing, and they gave notice to the insurer of abandonment. The insurer refused to accept the surrender, but proceeded to have the tug raised and repaired, and then tendered to the insured on condition of the payment of a sum claimed to be due from them for the repairs. Without waiving the right of abandonment, they requested a detailed statement of the account, and that a few days' test be made to determine whether the boat had been restored to as good condition as before the accident. These requests were not complied with, and they brought suit on the policy. *Held* that, whether or not they had the right to abandon in the first place as for a constructive total loss, their requests were reasonable, and they could not be required to accept the vessel, unless the conditions offered were complied with.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1251.]

3. INSURANCE ⬅398—ACTS AVOIDING POLICY—WAIVER.

A claim by the insurer of a vessel that the policy had been avoided by its assignment after a loss *held* waived, where the insurer proceeded to raise and repair the vessel under the provisions of the policy and demanded contribution from the insured.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1083.]

Appeal from the District Court of the United States for the Eastern District of Louisiana; Rufus E. Foster, Judge.

Suit in admiralty by Kahmann & McMurry against the Ætna Insurance Company of Hartford, Conn. Decree for respondent, and libelants appeal. Reversed.

For opinion below, see 236 Fed. 430.

---

John D. Grace, of New Orleans, La., for appellant.

Percy S. Benedict and Frank Wm. Hart, both of New Orleans, La. (Bernard McCloskey, of New Orleans, La., on the brief), for appellee.

Before PARDEE, WALKER, and BATTS, Circuit Judges.

BATTS, Circuit Judge. Kahmann & McMurry, appellants, instituted this suit upon a policy of marine insurance, issued by the Ætna Insurance Company, appellee, on the tug Greyhound. The policy was for $2,500, and fixed the value of the vessel at $3,000. For the difference between the value as fixed and the face of the policy the owners became coinsurers. Other pertinent provisions of the policy are hereafter noted. While plying in the Atchafalaya river, on January 23, 1908, the vessel struck an obstruction; a hole in the starboard bow resulting. She was put in to shore and lines were made fast to the bank. Syphons were rigged up, but she immediately filled with water. She settled on stumps amidship, listing outboard. After sinking, the roof of the cabin and the funnel could be seen; the water on the shore side being from 6 to 10 feet deep, and on the outside from 20 to 30 feet.

Libelants telegraphed the day of the accident to respondent's agents at New Orleans, notifying them that the boat had sunk, and thereafter that she was a total wreck. On the 26th day of January a representative of respondent viewed the vessel, and shortly thereafter operations to raise her were begun. On February 7th libelants made formal abandonment to respondent of all their rights in the wreck, and at the same time they indorsed on the policy an assignment to Capt. Victor Von Schoeler of all their rights, title, and interest in the policy, subject to its conditions. On February 12th agents of respondent addressed a letter to libelants, in which they stated that transfer of ownership had voided the policy, and notified them of "the cancellation of the policy in accordance with its terms." On the same day, however, the same representatives wrote the attorney for libelants, directing attention to section 5 of the policy, calling upon libelants to name a surveyor, and giving notice that, in default, a surveyor would be appointed by the respondent, who would cause the vessel to be surveyed at the expense of libelants. In accordance with this demand, Capt. Mark A. Morse was appointed inspector by the libelants, and on the 15th day of February, 1908, he made a report from which are taken statements as follows:

"The boat shows signs of having been severely strained, as the caulking is hanging out of her seams, which is evidence that the hull was and is strained and twisted. A complete survey cannot be made until the boat is dry-docked, and she should be cleaned of the sediment deposited over her and in her hull; but the examination made by me of her condition as she lies shows that she is worthless, and in my opinion not worth repairing. Her machinery is in such a rusted condition, and so covered with sediment deposited thereon while this vessel was sunk, that it will be necessary to take the machinery apart and clean it up, to determine whether it has sustained such damage as will impair its use."

He further reported:

"The cabin or upper works are destroyed, and must be rebuilt. There is a hole in her starboard bow, where a snag penetrated, causing the boat to sink."

This report was duly delivered to attorneys for respondent. None of the statements was at this time or afterwards disputed, but some of the conclusions were contested. It developed that employés of respondent intentionally destroyed the cabin to facilitate the raising of the vessel. This report of Capt. Morse was made after the vessel had been raised. Immediately thereafter the tug was taken from the scene of the wreck and docked in the yard of Drackett & Terrebonne, at Morgan City. On February 26, 1908, a survey was made by Capt. Albert Tourner, John R. Drackett, and T. J. Collins, and they detailed the repairs which they considered necessary to put the vessel in good seaworthy condition. On May 25th they made a report to the effect that the repairs indicated had been made to their entire satisfaction, and the opinion was expressed that the vessel was in a good and seaworthy condition. Libelants had no notice of these surveys. One of the surveyors was a member of the firm which repaired the vessel. One of the surveyors testified that the vessel was "river-worthy," as distinguished from seaworthy.

After the report of Capt. Morse had been received by respondent's agents, they wrote to their attorneys, who sent the letter to attorneys for libelants, stating that the damaged parts of the Greyhound would be duly repaired, and the boat put in as good condition as before the accident. This letter further stated that the expenses incident to the repairs would amount to only a few hundred dollars, and suggested that, under the terms of the policy, these repairs would have to amount to $2,250 in order to justify an abandonment. The letter further stated that, in accordance with the terms of the policy, the assured having neglected to recover or repair the vessel, they would continue the operations already begun, and cause the vessel to be repaired for account of the assured, and stating that due settlement would be made in accordance with the terms of the policy. In response, attorneys for the libelants wrote to attorneys for respondent:

"They [Mehle & Kausler, agents] made no mention of the fact that Capt. Morse reported that the hull was twisted and strained. If your clients understood what would be necessary to properly take out the twist and strain, they would not have suggested a sum, which will not be sufficient to even clean up and paint the boat in a proper manner, as a sum sufficient to rebuild this vessel."

The letter continued to the effect that the abandonment theretofore made was still insisted upon, and a claim for total loss persisted in, and gave notice that all costs and expenses incurred since the abandonment, and all costs and expenses which might thereafter be incurred, would be at the sole cost and expense of respondent.

After the repairs were made by Drackett & Terrebonne, a letter was addressed on March 31, 1908, by the attorneys for respondent to the attorney of the owners of the tug, in which they notified the latter that the Greyhound—

"is now lying at Morgan City, La., thoroughly repaired, in first-class condition, and that she is hereby tendered to your clients upon payment by them of the sum of $536.71, their proportion under the terms of this policy. The boat is in possession of Messrs. Drackett & Terrebonne, at Morgan City, and we stand ready at any time, upon the payment of the aforesaid amount of $536.71 to Mehle & Kausler, agents, to give a written order upon said Drack-

ott & Terrebonne for the delivery of said tug Greyhound. This notice is sent as a formal notice of tender of delivery, although you have heretofore declared an abandonment of the boat. In event we do not hear from you in 48 hours, we shall take such action in the premises as we deem expedient, in order to minimize any further damages, if any. We inclose a statement of how the amount of $536.71 is arrived at."

In response to this letter, attorneys for the libelants, on April 14th, wrote to attorneys of respondent:

"In the matter of the tug Greyhound, will say that my clients are advised that the tug Greyhound is not in substantially as good order and condition as immediately preceding the accident which resulted in wrecking her; that because of the fact that this vessel at the time of her loss was hung up over two stumps, situated about amidships, which sustained practically her whole weight, and resulted in hogging her to such an extent that, notwithstanding the repairs, such as they are, made by your clients, she will after a short time drop both her ends. My clients are desirous of learning if you will consent to a few days' test to satisfy you on that point. Still further, if the gross amount for which you seek to hold the owners is correct as to the cost of raising and repairing of this vessel, then the abandonment heretofore made was fully justified, even to the extent of the repairs already made which are by no means sufficient. I would like to have from you a detailed account of the amount you seek to charge my clients with."

In response to this letter attorneys for respondent wrote:

"We are willing to allow the tug Greyhound a dock trial, and a two hours' test in the river, provided that at test and trial we may be represented by Capt. Walter Thompson, of the New Orleans Drydock."

On May 26th attorneys for respondent sent to the attorney for the libelants the report heretofore referred to of the surveyors with reference to the repairs. Responding to this the attorney of the libelants wrote:

"This is the first knowledge of any kind that I or my clients have had of a survey had by the underwriters. We were not represented, and afforded no opportunity to be represented, as we were justly entitled to be. Therefore we refuse to recognize anything had or done thereby. As your clients declined to afford my clients a running trial of the boat, we will not consider the vessel in proper condition. Still further, as there has never been a formal adjustment of all the costs and expenses incurred, we do not concede that you have presented any account which we are legally bound to consider. I am instructed to say that, unless this matter is speedily settled without further unnecessary delay, I will be required to bring suit under the policy to recover the full amount of the policy as in case of total loss."

On May 28th the attorney for the libelants wrote to attorneys for the respondent:

"Your offer of a dock trial and a two hours' running test will not afford a sufficient test of fastenings, etc. My clients contend that because of the way in which the tug Greyhound was hung up amidships, with consequent fore and aft overhang and straining, that it would be impossible to make the vessel sufficiently strong and tight to enable her to retain her shape, but that the vibration of her engines is bound to cause the vessel to again drop her forward and stern ends, cause her to leak badly and prove, not only unseaworthy in the extreme, but absolutely worthless as a vessel. The trial my clients desire was one which would prove or disprove the foregoing contention. We are advised that even now the vessel is in such a leaky condition that the services of a watchman are necessary to keep her from sinking, and that she is so worthless as a vessel that, upon inquiry by the agents of the insurance company if the persons who repaired this vessel and retain its custody

for your clients could sell her for his bill, he was advised that she was not worth it. You offered to give a written order upon Drackett & Terrebonne for the delivery of the boat to my clients 'upon the payment by them of the sum of five hundred and thirty-six $71/100$ dollars,' which you say is their proportion under the terms of the policy. My clients deny that the boat is in a condition to justify a tender of her, and that the abandonment made to you was and is justified; that if the abandonment was not justified that your clients have no right to impose the conditions insisted upon; and again that if it was possible to restore the vessel to the condition she was in before her loss, and that you have done so, all of which is denied, even then you would have no right to insist upon payment in the sum named by you, and direct the people in whose custody you placed this wreck to not give it up until said sum is paid to them."

Paragraph 8 of the policy is as follows:

"There shall be no abandonment as for a constructive total loss in consequence of any loss or damage, unless the cost of the necessary repairs required solely by the disaster (exclusive of the cost of raising or rescuing the vessel and taking her to the dock and any other general average charges) be equivalent to seventy-five per cent. of the agreed value of the vessel, as specified herein; nor shall there be any right to abandon on account of said vessel grounding or being otherwise detained."

It is insisted by respondents that the circumstances which would justify abandonment as for a constructive total loss did not exist; that the expenses of repair, excluding the cost of raising and docking the vessel, were less than 25 per cent. of the value of the vessel, instead of 75 per cent., as required by the provision as to abandonment. It is argued by libelants that the abandonment clause is in conflict with the English and American rules as to what constitutes a total constructive loss, and that, being at variance with the substantial purposes of the policy as a contract of indemnity, the clause is void. It is certainly true that, under the terms of this clause, a contract intended to be one of indemnification might become, instead, a substantial liability of the insured. Under its terms as written, the cost of raising and docking the ship might exceed the amount of the insurance or the value of the vessel, and yet the vessel not be regarded as a constructive total loss. As the case may be disposed of upon other issues, it is not necessary to consider the validity of this clause.

[1] Whatever may constitute a constructive total loss, it is not incumbent upon the insured to raise and dock a vessel and have her repaired, in order to ascertain whether or not the repairs will constitute 75 per cent. of the agreed value of the vessel. The effort at abandonment, or the intention to abandon, may be in entire good faith, notwithstanding it subsequently appear that the repairs might be made for a lesser percentage than that required by the policy as the measure.

[2] The facts in this case do not indicate a lack of good faith on the part of the owners in notifying the insurers that the property would be abandoned as for a total loss. No question has been raised as to the facts stated by Capt. Morse in his report upon the vessel. While his conclusions may not be accepted, his statement of facts is unquestioned. He reported (Record, page 179):

"The boat is in a very bad condition, almost a complete wreck; the cabin or upper works are destroyed and must be rebuilt. There is a hole in her starboard bow where a snag penetrated, causing the boat to sink. This hole

is covered by a patch put on by the wreckers while the boat was submerged, and is apparently tight; otherwise, the boat is in a leaky condition. As the boat lies, it is impossible to locate these leaks, which makes it necessary to keep a close watch night and day, pumping at intervals. The boat shows signs of having been severely strained, as the caulking is hanging out of her seams, which is evidence that the hull was and is strained and twisted. * * * Her machinery is in such a rusty condition, and so covered with sediment deposited thereon while this vessel was sunk, that it will be necessary to take the machinery apart and clean it up, to determine whether it has sustained such damage as will impair its use."

In addition to making this report, Capt. Morse testified as to what he saw upon the occasion of his survey:

"She had been hanging on some particular point, and the overhanging weight in the water had strained her so that the planking was twisted from the timbers, and the oakum was hanging out of her seams all around above water, that you could see. There was not a great deal of her above water, only three or four seams, and those seams showed that the planks were twisted from the timbers, and the oakum was all falling out." "It [the strained and twisted condition] started from one end, and it was a gradual twist from her bow to her stern—complete twist. It was more in evidence just around her immediate stern. Her stern hung way over, down, very much on her starboard side—starboard quarter, at least." "The planks were started from the timbers, the planking was started and loose, and on the inside, just immediately under her decks, her main room deck clamps showed signs of straining. You could not see anything below in the inside of the boat, because she was full of mud and dirt of all kinds; but, from what was in sight, there was evidence of her being badly strained." "It was a general twist and strain of the boat, so they [deck and stiffening clamps] were loosened from the timbers; the fastenings were all loosened." "She was making water very freely. The main hole in the starboard bow that snagged the boat had been patched up by divers from the outside, and it was comparatively tight; but the general condition of the boat below, under the boilers and around, was such that the water was coming through. You could see the water coming into her; she had to be pumped frequently, they could not leave her, day or night; she had to be pumped right along. They had to keep a man day and night to keep her from sinking."

In answer to the question as to whether it was possible, by putting this vessel on dry dock, straightening her, and caulking the seams hard, for her to subsequently retain a straight position when launched in the water, Capt. Morse replied:

"No, sir; she would go back and take that twist. If you took her out and caulked her as you describe, and put her back in the water, she would be comparatively tight, but it would not be permanent."

Capt. Morse had been selected to make this inspection under the terms of the policy, and the former report made by him, and the conditions found by him, would seem to have amply justified the libelants in giving notice of abandonment of the vessel as for a constructive total loss. Paragraph 5 of the policy provides for proceedings in case of loss:

"In case of loss resulting from any peril covered under this policy, the assured shall use every effort for the safeguard and recovery of said vessel, by employing such means as can be obtained for that purpose, and, if recovered, shall cause the same to be forthwith repaired; and in case of neglect or refusal on the part of the assured, or the agents or assigns of the assured, to adopt prompt and efficient means for the safeguard and recovery of said vessel, or to repair said vessel when recovered, then the said insurers are here-

by authorized to interpose and have said vessel repaired, if she has been recovered, or to recover said vessel and cause the same to be repaired for account of assured; to the cost of which, after making any and all reductions referred to in clause 6 of the printed part of this policy, said company shall contribute in proportion as the sum herein insured bears to the agreed value stated in this policy. * * * "

Whether the insured were justified in treating the wreck as a total loss, and refusing to have her repaired or not, the policy provided for the contingency of such refusal, and the insurers acted upon the authority given them in that contingency. Notwithstanding the very apparently bad condition of the vessel, and notwithstanding the fact that the mere raising of her and getting her to dock cost approximately one-third of the agreed value of the vessel, she was, under the provisions just mentioned, raised, taken to the shipyard, and repaired. These repairs were in accordance with the survey heretofore referred to, of which the libelants had no notice; and after the repairs were completed, what is called a tender of the vessel was made to the insured, conditioned upon the payment of $536.71. Prior to this tender another survey was made by the same inspectors, again without any notice to the insured. This report stated that the vessel was in a good and seaworthy condition. During the interval between the wreck and this tender the insured had persisted in their action of abandonment. The insurers, on the other hand, acted upon the assumption that the circumstances authorizing abandonment did not exist.

When the conditional tender was made, the insured asked for an opportunity of ascertaining whether or not the conclusion of Capt. Morse that the vessel had been so strained that it could not be properly repaired was warranted. . This request for a test was based upon the assumption that the vessel, having been stayed by stumps amidships, her bow on the port side being held up by lines to the bank, and her stern being in deep water, all of the planks and fastenings of the vessel were strained from their proper position, and that the vessel was so seriously hogged that, while she might, after repairs, have the appearance of being seaworthy, the vibrations of the engine would cause the seams to almost immediately open, and that she would at once go down at both ends. The contention does not seem to be an unreasonable one, and the insured were certainly warranted in apprehending that the views of Capt. Morse (admittedly a person of capacity and experience) were justified by the facts. This request for a test was refused; the insurers proposing as a substitute to permit a dock trial and a running test of two hours on the river.

There was also, at the time of the tender, a suggestion by the attorney for the libelants that no proper statement had been made of the expenditures incurred, or said to have been incurred, by the respondent. The terms of the policy gave to the insurers, who acted under the provisions of paragraph 5, a lien upon the vessel for any amount which might be due as a result of the repairs made by them. In the alternative, it permitted them to have a personal claim against the insured. The insurers were amply protected in their expenditures; at least, they were amply protected, except upon the assumption that the vessel was incapable of being put in a proper condition by the

expenditures made by them, and that circumstances authorizing abandonment existed. The policy did not contemplate that, whenever the insurers, acting upon the authority given them by paragraph 5, had expenditures made, the insured, without opportunity to ascertain the extent or effect of these repairs, and without opportunity to ascertain the cost of the repairs, would have to pay any amount demanded and take the vessel. With characteristic solicitude for the insurers, the policy provides that, whenever repairs are made by the owner, all claims for repairs should be accompanied by vouchers, and by the oath or affirmation of the master that such repairs were actually made necessary by the accident. The policy contains no corresponding provision as to repairs made by the insurer; but certainly the insured in such case had the right to make the very reasonable demand expressed in the letter of the attorney of libelants, and certainly, unless some effort were made to meet this reasonable demand, the insured would be relieved from consequences which otherwise might result from the refusal to accept the vessel when tendered. Also the insured, warranted by the report of the inspector in the belief that the loss was total, and in the belief that such repairs as were possible (not involving entire reconstruction of the vessel) would not be permanent in their results, but that in a very short time the vessel would again be unseaworthy, were justified in demanding the test which they requested before taking over the vessel.

The reasonableness of the demands of libelants is further indicated by the facts developed after the conditional tender. It is now conceded that the demand as to the amount to be paid by the libelants was excessive. It is suggested that this was a mere mistake. This was doubtless the case, but the mistake was a substantial one, and one which would have been ascertained, and could have been corrected, if the reasonable request of the insured had been met. The insurers could very well have afforded to make an unconditional tender, inasmuch as they were amply protected by the lien upon the vessel, and by, in the alternative, a charge against the owners. There was no reason for the tender being at all conditional; and certainly, if a condition was to be imposed, it should have been one measured by the rights of the insured.

The request of the insured that they be permitted to make a test of the vessel was entirely reasonable, and the refusal to acquiesce in this request indicated a lack of confidence on the part of the insurer in the result of the work which had been done in the way of repairs. The subsequent history of the vessel strongly suggests that the views primarily expressed by Capt. Morse were correct, and the evidence indicates that after the repairs were made the effect of the strains of which he spoke was easily discernible. Capt. Morse testified to the following effect:

"I saw this vessel in the water after they had worked on her at the shipyard. I did not go aboard of her." "Q. At the distance from which you saw her, what was her condition in regard to the vessel's being in line? A. She was not in line. She still appeared to be dropped down at the stern and twisted; she still appeared to be hogged and twisted."

This statement referred to a condition existing very shortly after the repairs. Capt. Morse also testified that Mr. Drackett, the shipbuilder, stated to him that he would not take the vessel for what it cost to repair her. Asked as to the effect of running the engine on a vessel which had sustained injuries such as the Greyhound had sustained, which had been worked on to the extent she had been worked on, and which still had a twist or kink in the hull to the extent that he saw in her, Capt. Morse testified:

"Well, if her engines were running, and not in fit condition to stand the vibration, she would go right back into her former shape and leak. The caulking would not be tight."

Asked what would be the proper course for the shipwright to take out of the hull such a twist as he saw in the Greyhound, he replied:

"The course would be to put her on straight blocks, and take a twist out of her, shoe it out of her, or screw it out of her, whatever method would be adopted; there are different methods."

He stated that it would be necessary to probably renew the planking where it was strained, and put in new fastenings, new clamps, and new planking; that when a hull has such a twist as the Greyhound had, the fastenings are strained in every direction; that his impression was that it would be necessary to have a new stern and a new frame to make the Greyhound a strong boat; that the Greyhound was in such condition that she could not have been put in dry dock and her planking and timbers put in the condition in which they were originally; and that they would have to be taken out and new ones put in. He also stated that, after having seen the vessel after the repairs, he had no reason for changing his opinion, primarily expressed, to the effect that she was not worth repairing.

Capt. Thomas L. Morse testified that he saw the Greyhound while she was in the shipyard, and stated to the proprietor that—

"he has a pretty hard job to overcome, that the boat was pretty badly twisted, and that he would have to do a great deal of work on her, and that I did not think he could get her straightened out again."

He testified that after the repairs were made the Greyhound was laid up alongside an abandoned vessel belonging to his company. He noticed that she had water in her; that she was on a mud flat, and could not sink further, and stated:

"She was worth what she would bring for old junk—a couple of hundred dollars."

It appears from the evidence that after the repairs were made, and notwithstanding the fact that a watchman was kept aboard the tug, she sank as far as the mud would permit. Some year or more afterwards she became a total wreck by reason of a great storm.

To offset these specific statements of Capt. Morse and the actual experience of the Greyhound is the testimony of Mr. Drackett, who repaired her, and Mr. Collins and Mr. Tourner, who reported on her condition, that the vessel was, after repairs, in better condition than before the accident. It may be that the testimony is not conclusive as to the condition of the vessel after the repairs, and especially with reference to her condition as compared to the condition prior to the accident; but

it certainly indicates that the insured were not unreasonable in requesting that tests should be made of her.

Assuming that the abandonment was not, under the terms of the policy, justified as of a constructive total loss, and that the insurers were warranted in raising the tug and having her repaired, there was an obligation on their part to make a proper showing to the insured as to the amount of expenditures made, and the further obligation of turning the vessel over to the owners in as good condition as prior to the accident. While the duty is upon the libelants to prove their cause of action, this obligation would seem to be sufficiently met by proof that the accident occurred under conditions which imposed liability upon the insurance company; that the company, under the terms of the policy, took charge of the vessel; that the company refused to restore the vessel to insured, except upon payment of a sum in excess of what was due; that the company refused to give an opportunity to the insured to ascertain whether or not the vessel was in the condition in which it was prior to the accident; and that it is no longer possible for the insurers to restore the vessel.

[3] After the accident the insured made a transfer of the policy to Capt. Von Schoeler, indorsing this transfer on the back of the policy. A provision of the policy is to the effect that:

"This policy shall become void * * * upon any assignment of this policy, * * * unless notice is given to this company, and the same be approved and indorsed hereon in writing by an officer or duly authorized agent of the company."

The assignment having been made, notice was given to the company; without any suggestion of any injury resulting to the company from such assignment, and without assigning any reason for such action, the company declared the policy void because of the assignment made to Von Schoeler. It will not be necessary for us to consider whether such a provision in the policy can be arbitrarily used to defeat rights which have already arisen thereunder. It is enough to say with reference to the matter under consideration that, after having declared the policy voided by reason of this assignment, the insurers raised and docked the vessel and had her repaired, and made demands upon the insured for the costs of the repairs. They (the insurers) treated their cancellation as ineffective; and, since the insured had not complained of this, we see no reason why we should take a different view.

The judgment of the District Court will be reversed, and judgment here rendered for the libelants in the amount of their policy, with interest.