MATTSON v. CONNECTICUT FIRE INS. CO. OF HARTFORD (AGGREGATES CORPORATION et al., Interveners).

Civ. No. 895.

United States District Court
D. Minnesota, Fifth Division.

Oct. 9, 1948.

Jenswold, Butchart & Dahle, of Duluth, Minn., for plaintiff.

Gillette, Nye, Montague, Sullivan & Atmore, of Duluth, Minn., for defendant.

Fryberger, Fulton & Boyle, of Duluth, Minn., for intervener Aggregates Corporation.

Hunt, Palmer & Hood, of Duluth, Minn., for Northern Hardwood Veneers, Inc.

DONOVAN, District Judge.

Plaintiff commenced this action to recover damages for the total loss of a scow under a policy of marine insurance. Defendant denies liability to plaintiff, but admits liability to interveners Northern Hardwood Veneers, Inc., herein referred to as Northern, and Aggregates Corporation, herein referred to as Aggregates, for services rendered in salvaging the scow, "Butternut".

The case was tried to the court. The record is lengthy and many exhibits are in evidence. A summarization of the facts may be helpful.

Plaintiff purchased the scow from Northern on May 16, 1947. Northern had used it hauling logs and heavy machinery between ports on Lake Superior. On one occasion it carried 40,000 feet of lumber between Houghton, Michigan, and Bayfield, Wisconsin. On occasions prior to 1947, it had survived rough weather with waves going over the top of the deck. Northern considered the scow seaworthy, having spent $9,000 repairing it. Boiler flues had been installed shortly before the transfer of title to plaintiff.

The scow had been towed from Bayfield to the port of Duluth, Minnesota, by Aggregates' tug, "Elmar II", following which further repairs and replacements were made. Plaintiff applied for insurance. The scow was then inspected by Louis Dahlgren, who surveyed and approved it for insurance, and on June 13, 1947, plaintiff was advised by his brokers, Osborne & Lange, Inc., of Chicago, that insurance was effected with defendant in the amount of $10,000. The policy was issued in due course and is pleaded in defendant's answer, showing the term to be "at and from the 12th day of June 1947, at Noon, until the 12th day of June 1948, at Noon." It is a standard type insurance contract which, among other things, includes the so-called "Inchmaree", "sue and labor", "abandonment" and "notice and tender" clauses, the last of which designated United States Salvage Association, Inc. the defendant's representative for the purposes of serving notice of damage, determining necessity for docking, making a survey with a view to repairing the scow, and, as repaired, tendering the same to the assured.

Plaintiff leased the scow to Aggregates, and was then hired by the last-named party to act as superintendent in connection with work to be performed by the scow in loading, hauling and unloading sand in the vicinity of the ports of Duluth and Superior, on Lake Superior. Subsequent to said leasing, Aggregates, at 7 a. m. on July 3, 1947, with its tug, "Elmar II" lashed to the scow (tug and scow being under the command of Captain Malone), proceeded to take on a load of sand about one quarter of a mile from the entrance to Superior

Harbor. The load was one-third of capacity and of a 10% water content. The scow eliminated water that might seep into the hull by means of four steam syphons, two forward and two aft. Just prior to embarking for Duluth with the load, the fireman reported to Captain Malone that the scow was "dry". The weather was clear, without precipitation, and the wind was about five miles per hour. A sea of about one foot in height was running with the sides of the scow one foot above the surface of the lake.

After leaving the loading site and while enroute to destination, plaintiff thought the scow was "settling" to some extent and so informed the Captain, who responded by suggesting that it was but an illusion of one not accustomed to the sea. The journey continued until plaintiff noticed that the waves were rolling over the forward end of the scow. Plaintiff then had the temerity to direct the Captain's attention to this, and Captain Malone, after observing the tendency of the scow to submerge, decided to "beach her" and headed for land about one hundred feet distant, but the scow went down before reaching shore, with the forward end resting in four feet of water, and the opposite end in sixteen feet. The sinking occurred at about 1:30 p. m. on July 3, 1947, and plaintiff notified Louis Dahlgren immediately upon reaching shore. Dahlgren inspected the scow at about 7:00 p. m. on said date. Plaintiff expressed his intent to abandon the scow, but Dahlgren advised against this, saying it could not be done, and instructed plaintiff to remain with it during salvaging, assuring him defendant would pay him $25 per day while he remained with the scow. Dahlgren employed Aggregates to salvage the scow, and the latter employed Northern to assist in its raising and towing to a dry dock at Duluth or Superior. Northern's vessel, the "Plus-wood", arrived on Sunday morning, July 6th, and started to unload and raise the scow. Pumping commenced the next day, and as a result the scow was released and towed by the tug, "Elmar II", to the dock of Duluth Marine Iron Works. Rejected there, it was then towed on July 10th to the shipyard of Knudsen Bros. Shipbuilding &

Dry Dock Co. at Superior, where it was dry-docked at 3:30 p. m. on July 14th.

Dahlgren directed plaintiff to employ some one conversant with shipbuilding to make a survey of the condition of the scow, and plaintiff hired an experienced seaman and ship carpenter by the name of Werner J. Salin, who made a complete survey, following which plaintiff served formal notice of abandonment of the scow on defendant on August 13, 1947, wherein he demanded "payment of $10,000 insured by * * * [defendant] as and for a total loss" of the scow, and contends his loss is total, and that he is entitled to the full value of the scow as insured, i. e., $10,000, exclusive of all charges for salvaging and repairs.

Dahlgren directed Salin to remain on the job and "look after the work" performed on the scow in dry dock, which Salin did until September 4, 1947. He then reported to Dahlgren as follows:

"I have inspected and supervised the repairs on the wood barge 'Butternut' since July 17th. She went to dry dock on July 14th and I inspected her on July 17th. She came out of dry dock on August 12th. Carpenters finished work on August 15th. In general, the barge is seaworthy as far as repairs have been done except after-end of deck on scow requires renewal. Attached is a statement of specific work completed."

The scow has not been formally tendered back to plaintiff. Aggregates, Northern and Knudsen remain unpaid for services rendered in salvaging and repairing. To the date of trial all of said expenses, together with the expense for Salin and and plaintiff, approximate $8,000.

Defendant concedes the right of Northern and Aggregates to recover for salvaging and towing, but denies plaintiff's right to recover anything for the reasons:

1.  The scow was not seaworthy, and the policy did not cover loss attributable thereto;

2.  The Inchmaree clause insuring against a "latent defect" does not apply because the loss occurred "from want of due diligence" by plaintiff as "owner of the vessel";

3. There was no permissible abandonment of the scow by plaintiff.

Unfortunately, the trial court has been deprived of the opportunity to hear and consider the testimony of three key witnesses to the drama of the sinking of the "Wooden Scow 'Butternut'". Captain Malone, who was in charge at the time of the beaching, died before suit was commenced. At the trial the court was informed that Dahlgren was unable to testify due to a serious heart ailment. G. A. Myers, who signed intervener Aggregates' Exhibit 1 as "Principal Surveyor, Great Lakes District" for United States Salvage Association, Inc., did not testify.

Representing defendant, the Salvage Association report made by Myers as "Principal Surveyor" and Dahlgren as "Surveyor" (in evidence as Aggregates' Exhibit No. 1) discloses it to be a:

"Report of Survey made by the undersigned surveyor at the request of the United States Salvage Assn., Inc., in behalf of the underwriters concerned, on July 3, 1947, and subsequently, of the Derrick Barge 'Butternut' (Official Number 175655, Gross Tonnage 197, Mr. Fred Mattson, Owner, Aggregates Corporation, Operators), as the scow lay stranded and partially sunk off Minnesota Point in Lake Superior, laden with approximately 180 yards of sand, and on July 17, 1947, and subsequently, as the scow lay in dry dock at the Knudsen Brothers Shipbuilding Company, Superior, Wisconsin.

"Attending: Mr. Fred Mattson, owner, and Mr. W. Saline, representing owner

"July 3, 1947·

"The undersigned arrived alongside the scow at 7 p. m. and found it resting on sand bottom for the full length of deck, one foot above water line forward and three feet below aft, the position· being approximately 200' off shore abreast of Recreation Park, Minnesota Point, drawing approximately 6' forward and 10' aft.

"No log data available; however, following is the substance of statement made by Mr. Mattson:

"July 3, 1947, after loading sand, checked water in hull; found dry. Was aboard tug when noticed front end getting lower, so asked captain about it and he said 'no', but decided to beach scow about one mile west of loading location.

"Scow beached at 1:30 p. m. July 3, 1947.

"July 6, 1947

"Barge Pluswood arrived alongside Sunday morning, July 6, and started unloading sand at request of Aggregates Corporation. Finished Sunday evening, unloading the sand at Aggregates Corporation's Duluth dock.

"July 7 to 9, 1947

"Started pumping scow Monday morning. Scow released 1:30 p. m. Wednesday the 9th. Tug Elmar II towed barge to Duluth Marine Iron Works' Dock, arriving there about 4:30 p. m. July 9.

"July 10, 1947

"Tug Elmar II towed scow to Knudsen Bros. Shipyard at Superior, Wisconsin.

"July 14, 1947

"Scow dry-docked 3:30 p. m. at Superior and surveyed.

| "Found | Recommended |
|---|---|
| 1. Braces in hold broken. | 1. Twelve pieces to be renewed; 8'x8''x6'' fir. |
| 2. Bottom caulking sprung. | 2. Approximately 26 seams, 40' long, to be recaulked and sealed with tallow. |
| 8. Deckhouse (afterside) broken and splintered and ladder broken. | 8. Ladder to be renewed; 12'x3' pine. Deckhouse to be repaired (150 square feet of 1'' shiplap). |

Note: Anchor lost while scow being beached.

"Repairs as herein recommended have been made to the satisfaction of the undersigned by the Knudsen Bros. Shipbuilding Company, Superior, Wisconsin.

"Scow dry-docked July 14, 1947, and undocked August 5, 1947.

"Repairs started July 17, 1947, and completed August 15, 1947.

"Survey made without prejudice and subject to the terms of the policy."

This report confirms some of the more important facts hereinbefore recited.

■ Was the scow seaworthy? We are here concerned with the condition of the scow under the time policy pleaded by defendant and introduced in evidence by plaintiff. The implied warranty that the

scow was seaworthy is complied with if it was seaworthy at the commencement of the risk, and the fact that she may subsequently sustain damage does not discharge the insurer from risk or loss that may follow provided such "loss or damage has not resulted from want of due diligence" by the owner. Union Insurance Co. v. Smith, 8 S.Ct. 534, 124 U.S. 405, 31 L.Ed. 497.

█ At the outset it should be said that the court is satisfied from the record that plaintiff was inexperienced in the matters of sea-going vessels and marine insurance, and that Dahlgren and Myers, as surveyors for the United States Salvage Association, Inc., also acted for defendant in what they did for defendant's representative under the terms of the policy, and the court holds the defendant was charged with knowledge of what Dahlgren did and acquiesced therein. Breuer v Continental Ins. Co., 188 Minn. 112, 246 N.W 533. Further, that proper notice was served on defendant by plaintiff relative to the claims herein made by him.

█ I believe the record of this case shows the scow capable of meeting the exigencies arising in the different types of weather prevalent and met with on the Great Lakes during the period of time here involved. It did not founder or sink on the trip it made from Bayfield to Duluth and before docking for repairs prior to July 3, 1947. The insurance was issued after a survey was made by Dahlgren, whom I cannot disassociate from defendant.

█ There is a presumption of law that a vessel is seaworthy until the contrary is proved, and defendant has the burden in the instant case of proving the scow to be unseaworthy. Fireman's Fund Insurance Co. v. Globe Navigation Co. et al., 9 Cir., 236 F. 618; Batchelder v. Ins. Co. of North America, D.C., 30 F. 459; Thames and Mersey Marine Ins. Co. v. Pacific Creosoting Co., 9 Cir., 223 F. 561; American Merchant Marine Ins. Co. v. Margaret M. Ford Corporation, 2 Cir., 269 F. 768.

If the vessel was seaworthy at the inception of the risk under the facts of the present case, can it be said the loss occurred by reason of a peril insured against? Defendant urges that in light of the evidence tending to show fair weather, there was no such peril encountered. There is persuasion in this suggestion, but consideration given to the history of the scow and its performance on the Great Lakes under various sorts of conditions showing it behaved well in bad weather while hauling logs and bulky machinery, and the situation that arose following the report of the fireman on the scow to Captain Malone that the hull was "dry" just before leaving on the journey that led to the settling and beaching, leads me to infer that the loss sustained by plaintiff arose out of a peril insured against. Compania T. Centro-Americana, S. A., v. Alliance Assur. Co. Ltd., D.C., 50 F.Supp. 986; Massey Steamship Co. v. Importers' and Exporters' Insurance Co. of New York, 153 Minn. 88, 189 N.W. 415, 31 A.L.R. 1372.

In the last-cited case, the defendant insurer (153 Minn. 93-95, 189 N.W. 417, 418):

"* * * asserted that not only did plaintiff fail to supply the necessary proof [of a latent defect in the hull, or an accidental injury to it as covered by the Inchmaree clause], but that the circumstances attending the sinking indicate that *the hull was so old, worn, and decayed that the steamer was unseaworthy and sank from inherent weakness*. Upon a somewhat similar state of facts it was held in Anderson v. Morice, L.R. 10 C.P. 58, that the cause of the sinking of a ship should be left to the jury. * * * But, even though the jury might not safely conjecture what it [the cause] was, they could nevertheless conclude, as they did in Anderson v. *peril of the sea, or that there must have been a hidden defect in the hull, and in either case the loss was covered by the* Morice, that *it must have resulted from a policy.*" (Emphasis supplied.)

█ A presumption of loss from perils of the sea or latent defects is raised when the assured submits proof that the scow was seaworthy at the inception of the risk, as plaintiff did in the case at bar when he, at the suggestion of his broker, hired Dahlgren to inspect it for insurance and Dahlgren did survey it and approved it for the marine insurance defendant later issued.

106

Zillah Transp. Co. v. Ætna Ins. Co. et al., 175 Minn. 398, 221 N.W. 529.

■■■■ The Inchmaree clause in my opinion also applies to the facts of the instant case. It must be admitted there is little in the record to support the claim of perils of the sea attributable to extraordinary causes. Defendant, like the insurer in the Massey case, supra, contends the hull of the scow, as observed in dry dock, was so old, rotten and dilapidated as to make it unseaworthy at all times herein, so that the loss was due to such a peril, and which it is claimed was not covered by the policy, citing Fireman's Fund Ins. Co. v. Compania deNavigacion Interior, S. A., 5 Cir., 19 F.2d 493; Cary v. Home Insurance Co., 235 N.Y. 296, 139 N.E. 274. The Minnesota cases cited, supra, however, oppose defendant's contention. But assuming defendant is correct in the respect contended, there seems no escape from the application of the Inchmaree clause in the marine policy which controls the instant case. The words of that policy are the words of the insurer; hence they are construed most strongly against the insurer, and most favorable to the insured. Royal Insurance Co. v. Martin, 192 U.S. 149, 24 S.Ct. 247, 48 L.Ed. 385. Thames & Mersey v. Pacific Creosoting Co., supra. The insurance here under consideration covered loss due to "any latent defect". The foundering of the scow was undoubtedly the result of a fortuitous entry of lake water. It was sinking when beached. The beaching and effect of the surrounding water obliterated any possible chance of determining cause to be other than a "latent defect" in the scow, and I so conclude.

■■■■ The question of abandonment is a difficult one. The day following the sinking, plaintiff informed Dahlgren that he was abandoning the scow. Dahlgren advised plaintiff he could not abandon it. On July 14, 1947, the scow was dry-docked and surveyed by defendant's representative and repairs completed on August 15. On August 13th plaintiff served formal notice of abandonment on defendant. On October 1, 1947, plaintiff sent defendant by registered mail his proof of constructive total loss. Except for Dahlgren's advice to the owner that he could not abandon, de-

fendant has adhered to a policy of silence and inaction. In my opinion plaintiff has accomplished all that can reasonably be expected of him in notifying defendant of abandonment and proof of loss. He has substantially complied with the terms of the policy. That is all the law requires of the assured. That defendant had sufficient notice thereof is conceded from defendant's denial of liability based on its claim that the scow was unseaworthy. Copelin v. Insurance Company, 76 U.S. 461, 9 Wall. 461, 19 L.Ed. 739; American Marine Ins. Co. v. Margaret M. Ford Corporation, supra; 45 C.J.S., Insurance, § 964.

Is plaintiff's claim under the policy for constructive total loss supported by the evidence of the instant case? The contract of insurance expressly provides:

"No abandonment shall in any case be effectual unless notice thereof be made in writing to the Agents of the Underwriters, nor unless the expense of recovering and repairing the Vessel, as finally established, exceeds the combined value of Vessel, etc., as stated herein * * * [and the insurer] shall have the right to tender the Vessel back to the Assured at the conclusion of the salvage operations, if at that time it appears that the expense incurred * * * in recovering and repairing the Vessel does not exceed such combined value."

The record is barren of anything suggesting that defendant has itself complied with the last-quoted term of the policy. While defendant has conceded liability for salvaging, I can nowhere in the record find that it assumed responsibility for the repairs made. The reasonable value of the expense met with in salvaging and repairing the scow to the date of trial approximates $8,000. This is based on charges actually made. Plaintiff's experts testified that in its present repaired condition it is not seaworthy, and to make it so will require a further expenditure that, added to the expense of $8,000 already incurred, would exceed the value of the insured vessel. Salin, who was hired by plaintiff to give him an estimate of what would be required, after performing that service continued on as an agent of defendant or Dahlgren, and on September 4th made a report to the effect that it was then sea-

worthy. But this is modified by the testimony of plaintiff's last two experts, whose testimony opposes Salin's.

 The expense already incurred and the additional expense required to make the scow seaworthy so exceeds the value of the vessel as to constitute a constructive loss under the terms of the policy. As presently repaired, the scow has not been tendered to or accepted by plaintiff. Kahmann & McMurry v. Ætna Ins. Co., 5 Cir., 242 F. 20. In my opinion, plaintiff has carried his burden of proof tending to establish constructive loss of the scow. 45 C.J. S., Insurance, § 956. Plaintiff has abandoned all his interest in the vessel to the insurer, and I think he has substantially complied with the terms of the policy and is entitled to recover for a constructive total loss.

Plaintiff may, upon reasonable notice, submit findings of fact and conclusions of law, together with form of judgment consistent herewith.

An exception is allowed defendant.