## ROYAL INSURANCE COMPANY *v.* MARTIN.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF PORTO RICO.

No. 86.   Argued December 8, 9, 1903.—Decided January 11, 1904.

This court has jurisdiction to review, on writ of error, a final decision of the Supreme Court of Porto Rico, where the value or sum in dispute exceeds $5000, exclusive of costs. The Circuit Court of Appeals Act of 1891 does not apply to such a case.

Where a policy of insurance excepts loss happening during invasion, rebellion, etc., unless satisfactory proof be made that it was occasioned by independent causes, a notice by the company, without demanding proof, that it will not pay the loss because it was occasioned by one of the excepted causes amounts to a waiver, and relieves the insured from producing such proofs before commencing suit, and how the loss was occasioned is for the jury to determine.

Where a policy for separate specified amounts on a building and goods contained in it provides that it shall cease to be in force as to any property passing from the insured otherwise than by due process of law without notice to, and endorsement by, the company, a transfer of all the goods by the insured to a firm of which he is a silent partner, the active partners having possession and control, is such an alienation as will avoid the policy in respect to the goods, but not as to the building separately insured.

THE facts are stated in the opinion.

*Mr. William G. Choate* for plaintiff in error:

This court has jurisdiction of this case. Act establishing the government of Porto Rico, act of April 12, 1900, c. 191, 31 Stat. 85.

The law determining the cases in which writs of error to and appeals from the Supreme Courts of the Territories of the United States may be taken, appears in the following statutes: Rev. Stat. § 702; act of March 3, 1885, c. 355, 23 Stat. 443; Circuit Court of Appeals act of March 3, 1891, c. 517, § 15, 26 Stat. 826, 828, and see *Shute* v. *Keyser,* 149 U. S. 649; *Aztec Mining Co.* v. *Ripley,* 53 Fed. Rep. 7; *S. C.,* 151 U. S. 79; *Folsom* v. *United States,* 160 U. S. 121; and *Simms* v. *Simms,* 175 U. S. 162, 166, where the effect of these statutes is considered, that the appellate jurisdiction of this court from Supreme Courts of the Territories remains unimpaired, except as such appellate jurisdiction is transferred to the Circuit Courts of Appeals by the act of 1891.

The suits of which the Circuit Court has jurisdiction in which an alien is a party are necessarily limited by the Constitution to "controversies between a State or the citizens thereof and foreign States, citizens or subjects" (Constitution, art. 3, sec. 2). This does not include under the term "citizens thereof" a citizen of Porto Rico; it necessarily means a citizen of one of the United States. And this limitation of suits in which an alien is a party to suits between aliens and citizens of the United States is recognized in the 6th section of the Circuit Court of Appeals act, which has received a construction excluding its application to suits between foreign States and a citizen of the United States. *Colombia* v. *Cauca Co.,* 190 U. S. 524, 526. And see *Snow* v. *United States,* 118 U. S. 346, 352; *Ex parte Wilder's S. S. Co.,* 183 U. S. 545; *Union Central Life Ins. Co.* v. *Champlain,* 116 Fed. Rep. 858.

On the merits the court below erred:

Upon the undisputed evidence in the case the policy was

voided by this change of interest in the stock of goods, a part of the property insured.   *Germania Fire Ins. Co. v. Home Ins. Co.,* 144 N. Y. 195, 199; *Drennen v. London-Assurance Co.,* 20 Fed. Rep. 657; *S. C.,* 113 U. S. 51; *London Assurance Co. v. Drennen,* 116 U. S. 461; *Card v. Phœnix Ins. Co.,* 4 Mo. App. 424. Cases in the Supreme Court of Iowa subsequent to the case of *Cowan v. State Ins. Co.,* 40 Iowa, 551, which is relied on by the defendant in error, distinguish that case on the ground that there was no provision in the policy in that case relating to a change of title or interest, but a provision merely in respect to a sale or conveyance which was held to mean a technical sale of the whole property.   *Hathaway v. State Ins. Co.,* 64 Iowa, 229; *S. C.,* 20 N. W. Rep. 164; *Oldham v. Ins. Co.,* 90 Iowa, 225; *S. C.,* 57 N. W. Rep. 861; *Jones v. Phœnix Ins. Co.,* 97 Iowa, 275; *S. C.,* 66 N. W. Rep. 169, and see *Beggs v. Ins. Co.,* 88 N. Car. 141; May on Ins. (4th ed.) § 279; 3 Joyce on Ins. §§ 2293–2295, and note reviewing cases; 1 Biddle on Ins. § 224; Elliott on Ins. § 273; Porter on Ins. (2d ed.) 180.

The ruling of the court deprived the defendant of the right to have the verdict limited to the building if the condition did not affect the insurance on the building also.   This defence of a change of interest was fairly raised by the special plea and also by the general issue.   *Edson v. Weston,* 7 Cow. 280; Chitty on Pl. 6th Am. ed. 513; *Oscanyan v. Arms Co.,* 103 U. S. 261, citing 1 Chitty on Pleadings, 493; *Craig v. The State of Missouri,* 4 Pet. 410, 426; *Young v. Rummell,* 2 Hill (N. Y.), 278.

The policy was void, for the reason that the fire occurred, as the testimony shows, during an invasion, riot, etc.

A fair construction of this condition in the policy is that where a state of invasion or martial law exists in the neighborhood where the fire was, the company is not liable for the loss by fire, unless there be some evidence that the fire was attributable to some other cause.   The presumption created by the policy is that it was attributable to the invasion.   It is not enough that there was no evidence as to any other cause, as was the fact here.   The policy required that there should

be affirmative evidence attributing the fire to some other cause. It may not be necessary to hold, in accordance with the literal interpretation of the condition, that the directors must be satisfied that there was not some other cause. It may well be that, if there was proof of some other cause, the mere fact that the directors were not satisfied by it would not be enough.

The case then was one where the evidence was undisputed of the existence of invasion in the very district of country where the property was situated and the main body of the invading troops was within three and a half miles of the property, and at the request of the owner of the property a detachment of soldiers was sent to the very place insured. The defendant's counsel might well have asked the court to rule that a state of invasion did exist at the place where the property was, but the instruction asked was simply that if the jury found the fact of invasion, etc., then the plaintiff could not recover. This the plaintiff in error was entitled to upon the state of the proof.

*Mr. Fritz v. Briesen* for defendant in error:

This court has no jurisdiction.

It is evident that Congress did not intend to have cases involving no more than questions of general law go to the Supreme Court of the United States.

Sections 5 and 6 of the Court of Appeals Act have received the consideration of this court in a number of cases. *Borgmeyer* v. *Idler,* 159 U. S. 458; *Voorhees* v. *Noyes Mfg. Co.,* 151 U. S. 135; *Rouse* v. *Letcher,* 156 U. S. 47; *Carey* v. *Houston & Texas Central Ry. Co.,* 161 U. S. 115; *Rouse* v. *Hornsby,* 161 U. S. 588; *Press Pub. Co.* v. *Monroe,* 164 U. S. 105; *Ex parte Jones,* 164 U. S. 691.

Nor is the case appealable under § 15 of the act relating to appeals from Territories. As to construction of act of Congress and ascertaining intent of Congress, see *United States* v. *Union Pacific R. R. Co.;* 91 U. S. 72; 1 Kent's Com. 162,

cited in *People* v. *Draper*, 15 N. Y. 532; *McLish* v. *Roff*, 141 U. S. 661, 666. Cases on plaintiff in error's brief distinguished.

. This case is substantially one brought by a citizen of the United States against an alien.

It is admitted that a citizen of Porto Rico is not a citizen of the United States, but on the other hand he is not an alien, so that although this case would, strictly speaking, not be one between a citizen of the United States and an alien, it would on the other hand, not be one between an alien and an alien. Porto Rico is not a foreign country. *De Lima* v. *Bidwell*, 182 U. S. 198, 200; *Fourteen Diamond Rings* v. *United States*, 183 U. S. 176, 179. An alien means nothing more than a citizen or subject of a foreign State. *Milne* v. *Huber*, 3 McLean, 212; *S. C.*, 17 Fed. Cas. 405, 406.

Such an anomalous position has not been provided for directly by the Judiciary Act of March 3, 1891, but as to position of citizens of Porto Rico, see § 7, Foraker Act.

Congress could never have intended to deprive a United States citizen of his right to an appeal and in the same breath confer it upon a citizen of Porto Rico. *Lau Ow Bew* v. *United States*, 144 U. S. 47.

The court did not err in its rulings with reference to the defence that the transfer of the personal property covered by the policy from Francisco Martin, the assured, to Martin Brothers voided the policy.

The law and decisions in the States of the Union on this point are very conflicting and the question cannot be decided upon the authority of the decisions of any State or group of States, but the *lex loci contractus*, to wit, that of Porto Rico, should be understood. *Bank of the United States* v. *Donnally*, 8 Pet. 361, 372. No Spanish laws or decisions are submitted by counsel for plaintiff in error, so that no opportunity is given this court to arrive at a correct conclusion on this important point. This court cannot decide this question because it cannot be presumed to know the Spanish laws and decisions on the subject of partnership, fire insurance and construction of

contracts. Waiving, however, this fatal defect for the present, the question will be argued as a question of American law. There was no error in the court below. *Ayres* v. *Hartford Ins. Co.*, 17 Iowa, 176; 1 Biddell on Ins. 199; *Washington Fire Ins. Co.* v. *Kelley*, 32 Maryland, 421, 434; *Scanlon* v. *Union Fire Ins. Co.*, 4 Biss. 511; *Blackwell* v. *Insurance Co.*, 48 Ohio St. 533, 540; *Cowan* v. *Iowa State Ins. Co.*, 40 Iowa, 551, citing May on Insurance, pp. 463, 381, pp. 303, 278; *Hitchcock* v. *N. W. Ins. Co.*, 26 N. Y. 68; *West Branch Ins. Co.* v. *Helfenstein*, 40 Pa. St. 289; *Sherman* v. *Niagara Fire Ins. Co.*, 2 Sweeney, 470; *Fernandey* v. *Great Western Ins. Co.*, 3 Robertson, 457; *Hoffman* v. *Place*, 32 N. Y. 405, and see the Scotch case of *Forbes* v. *Border Counties Fire Office*, 11 Court of Sessions, 3d Series, 278.

The refusal of the judge to order the jury to return a separate verdict was not a reversible error. If the judge was correct in his ruling on the question of alienation, then no separate verdict was necessary. Defendant did not request a charge for a separate verdict until after the jury had returned its verdict when it was too late. *Pacific Express Co.* v. *Malin*, 132 U. S. 531, and see 22 Ency. Pleading & Practice, p. 912; *Texas & P. Ry. Co.* v. *Padgett*, 36 S. W. Rep. 300.

There was no error in the rulings of the court with reference to the ground of defence that the policy was void for the reason that the fire occurred during an invasion, riot, etc.

In case a loss by fire occur during the existence of an invasion or riot, the board of directors *may call for proof* that such loss was not occasioned by the invasion, and if such proof be not furnished, or, if furnished, be not reasonably satisfactory, no action on the policy may be maintained. The condition was inserted merely for the protection of the stockholders of the company, in that it placed a check upon the board of directors by providing that they should not pay certain claims without first calling for satisfactory proof that the loss was not due to certain casualties which were not insured against. *Braunstein* v. *Accidental Death Insurance Co.*, 1 Best & Smith,

783; *Baillie* v. *Assurance Co.*, 49 La. Ann. 658, 661. See also *La Societe, etc.,* v. *Wm. B. Morris & Co.*, 24 La. Ann. 347; *Monteleone* v. *Insurance Co.*, 47 La. Ann. 1563; *National Union* v. *Thomas*, 10 App. D. C. 277. It does not throw the burden of proof on the insured. *German Ins. Co.* v. *Frederick*, 58 Fed. Rep. 144; forfeitures, as this would be, are not favored in the law. 1 Wood on Fire Insurance (2d ed.), 161, citing *Hoffman* v. *Ætna Insurance Co.*, 32 N. Y. 405; *Reynolds* v. *Commerce Ins. Co.*, 47 N. Y. 597, and many other cases; and see *Insurance Company* v. *Eggleston*, 96 U. S. 572, 577; *Insurance Co.* v. *Norton*, 96 U. S. 234.

MR. JUSTICE HARLAN delivered the opinion of the court.

This was an action by the executor of the insured on a policy of insurance made by the Royal Insurance Company, a British corporation, whereby that company insured Francisco Martin against loss or damage by fire to the amount of seven hundred pounds on a certain building at Coto Laurel, District of Ponce, Porto Rico, and for nine hundred pounds on the stock in trade contained in such building.

The declaration alleged and the fact was not disputed that during the term of the policy all the property insured was destroyed by fire. The case was tried by the court and a jury and a verdict was returned in favor of the plaintiff for $7623, the court refusing to require the jury to find the damages, separately, as to the building and the stock of goods; and for the above amount judgment was rendered against the company.

The defendant in error disputes the jurisdiction of this court to review the judgment below. If this position be well taken, the writ of error should be dismissed without considering the merits of the case. *Continental Nat. Bank* v. *Buford*, 191 U. S. 119. We must therefore examine the question of the jurisdiction, which depends upon the scope and effect of various statutory provisions, including those relating to the court established by Congress in Porto Rico. We will look at the statutes according to the respective dates of their enactment.

By section 702 of the Revised Statutes of the United States it is provided that "the final judgments and decrees of the Supreme Court of any Territory, except the Territory of Washington, in cases where the value of the matter in dispute, exclusive of costs, . . . exceeds $1,000, may be reviewed and reversed or affirmed in the Supreme Court, upon writ of error or appeal, in the same manner and under the same regulations as the final judgments and decrees of a Circuit Court. In the Territory of Washington the value of the matter in dispute must exceed $2,000, exclusive of costs. And any final judgment or decree of the Supreme Court of said Territory in any cause [when] the Constitution or a statute or treaty of the United States is brought in question may be reviewed in like manner."

This provision was modified by the act of March 3, 1885, entitled "An act regulating appeals from the Supreme Court of the District of Columbia and the Supreme Courts of the several Territories;" for by the latter act it was provided: "§ 1. That no ppeal or writ of error shall hereafter be allowed from any judgment or decree in any suit at law or in equity in the Supreme Court of the District of Columbia, or in the Supreme Court of any of the Territories of the United States, unless the matter in dispute, exclusive of costs, shall exceed the sum of five thousand dollars. § 2. That the preceding section shall not apply to any case wherein is involved the validity of any patent or copyright, or in which is drawn in question the validity of a treaty or statute or an authority exercised under the United States; but in all such cases an appeal or writ of error may be brought without regard to the sum or value in dispute." 23 Stat. 443, c. 355.

Then came the act of March 3, 1891, "to establish Circuit Courts of Appeals, and to define and regulate in certain cases the jurisdiction of the courts of the United States, and for other purposes." 26 Stat. 826. The 5th section of that act prescribes the cases that may be brought directly to this court from the District Courts or from the existing Circuit Courts of

the United States, while the 6th section provides that the Circuit Courts of Appeals "shall exercise appellate jurisdiction to review by appeal or by writ of error final decision in the District Court and the existing Circuit Courts in all cases other than those provided for in the preceding section of this act, unless otherwise provided by law"—the judgments or decrees of the Circuit Courts of Appeals to be final "in all cases in which the jurisdiction is dependent entirely upon the opposite parties to the suit or controversy being aliens and citizens of the United States or citizens of different States; also in all cases arising under the patent laws, under the revenue laws, and under the criminal laws and in admiralty cases." Further, by the same section: "In all cases not hereinbefore, in this [6th] section, made final, there shall be of right an appeal or writ of error or review of the case by the Supreme Court of the United States when the matter in controversy shall exceed one thousand dollars, besides costs." The 13th section of the act provides: "Appeals and writs of error may be taken and prosecuted from the decisions of the United States Court in the Indian Territory to the Supreme Court of the United States, or to the Circuit Court of Appeals in the Eighth Circuit, in the same manner and under the same regulations as from the Circuit or District Courts of the United States, under this act." And the 15th section is in these words: "That the Circuit Court of Appeal *in cases* in which the judgments of the Circuit Courts of Appeal are made *final* by this act shall have the same appellate jurisdiction, by writ of error or appeal, to review the judgments, orders and decrees of the Supreme Courts of the several Territories, as by this act they may have to review the judgments, orders and decrees of the District Court and Circuit Courts; and for that purpose the several Territories shall, by orders of the Supreme Court, to be made from time to time, be assigned to particular circuits." 26 Stat. 826.

This brings us to the act of April 12, 1900, c. 191, entitled, "An act temporarily to provide revenues and a civil govern-

ment for Porto Rico, and for other purposes." 31 Stat. 77, c. 191.

By section 33 of that act it is declared, among other things, that the judicial power shall be vested in the courts and tribunals of Porto Rico as then established and in operation, under and by virtue of certain General Orders promulgated by military authority—the Chief Justice and Associate Justices of the Supreme Court of Porto Rico and the Marshal thereof to be appointed by the President, by and with the advice and consent of the Senate, and the judges of the district courts by the Governor, by and with the advice and consent of the executive council.

By the 34th section of that act Porto Rico was constituted a judicial district to be called the District of Porto Rico with a district judge, a district attorney and marshal to be appointed by the President, by and with the advice and consent of the Senate, and with a district court called the "District Court of the United States for Porto Rico," which court, in addition to the ordinary jurisdiction of District Courts of the United States, shall have jurisdiction of all cases cognizant in the Circuit Courts of the United States.

The section of the Porto Rico act upon which the question of our jurisdiction mainly depends is the 35th, which is in these words: "That writs of error and appeals from the final decisions of the supreme court of Porto Rico and the district court of the United States shall be allowed and may be taken *to the Supreme Court of the United States* in the same manner and under the same regulations and *in the same cases* as from the supreme courts of the Territories of the United States; and such writs of error and appeal shall be allowed in all cases where the Constitution of the United States, or a treaty thereof, or an act of Congress is brought in question and the right claimed thereunder is denied; and the supreme and district courts of Porto Rico and the respective judges thereof may grant writs of *habeas corpus* in all cases in which the same are grantable by the judges of the district and circuit courts of the

United States. All such proceedings in the Supreme Court of the United States shall be conducted in the English language." 31 Stat. 77, 85, c. 191.

It thus appears that writs of error and appeals may be prosecuted directly to this court from the District Court of the United States for Porto Rico, in the same manner, under the same regulations, and "in the same cases" as from the Supreme Courts of the Territories of the United States.

Could a case like the one before us have been brought directly to this court from the Supreme Court of one of the Territories of the United States? If so, our jurisdiction in this case cannot be disputed under the Porto Rico act.

The question just stated must be answered in the affirmative, if we look alone at section 702 of the Revised Statutes, and the act of March 3, 1885, c. 355; for, it is clear from the express words of those enactments that this court may review the final judgment of the Supreme Court of one of the Territories of the United States in any case, without regard to the sum or value in dispute, where the Constitution or a statute or treaty is brought in question, and in every other case whatever where the sum or value in dispute exceeds $5000, exclusive of costs.

Is this result, so far as the final judgments of the District Court of the United States for Porto Rico are concerned, affected by anything in the Circuit Court of Appeals act of 1891? We think not. That act, no doubt, contemplated a review by the appropriate Circuit Court of Appeals, first, of the final judgments of the United States court in the Indian Territory in all cases covered by section 702 of the Revised Statutes and the act of March 3, 1891; second, of the final judgments of the Supreme Courts of the other Territories of the United States in cases the judgments in which, by that act (§ 6), are made final. No provision is found in the act of 1891 for the review in a Circuit Court of Appeals of the judgment of the Supreme Court of a Territory of the United States in a case of the class the judgment in which, if rendered in a Circuit Court of Appeals, is not final. So that the jurisdiction

of this court to review the judgments of the Supreme Courts of the several Territories in that class of cases was the same after as before the passage of that act. *Shute* v. *Keyser*, 149 U. S. 649. Clearly this case is not of the class the judgment in which, if rendered in the Supreme Court of a Territory of the United States, to use the words of the act of 1891, is reviewable in a Circuit Court of Appeals under that act. It is not a patent, revenue or criminal case, nor one in which the jurisdiction of the court below depended entirely upon the opposite parties to the controversy being aliens and citizens of the United States or citizens of different States. But it is one which, if it had been determined by the Supreme Court of one of such Territories of the United States, could have been brought here directly, upon writ of error, after as well as before the passage of the act of 1891. Our conclusion must, therefore, be that the jurisdiction of this court cannot be denied by reason of any provision in the act of 1891.

This view is strengthened by what we deem the better construction of the Porto Rico act of 1900. That act does not refer to the Circuit Court of Appeals act of 1891, nor contain any provision looking to the assignment of Porto Rico to one of the established Circuits. This tends to show that it was the intention of the act of 1900 to establish a direct connection between this court and the United States Court for Porto Rico in respect of every case which, if determined by the Supreme Court of a Territory of the United States, could have been brought here under the statutes in force when the act of 1891 was passed. In our opinion, Congress did not intend that any connection should exist between the United States Court for Porto Rico and any Circuit Court of Appeals established under the act of 1891.

These views as to the scope and effect of the Porto Rico act of 1900 are not at all affected by the provisions in the acts relating to the reëxamination of the final judgments of the highest courts of the Indian Territory, Hawaii and Alaska. *Indian Territory*, 26 Stat. 826, c. 517, § 13; *Hawaii*, 31 Stat. 141, 153,

c. 339, § 86; *Alaska,* 31 Stat. 321, 345, c. 786. Those acts had exclusive reference to the particular Territories named—each, upon its face, showing that the final judgments of the courts of those Territories, at least in certain cases, should be reviewable, primarily, in a designated Circuit Court of Appeals of the United States. No such provisions are found in the act of 1900, and this court has not assumed to assign Porto Rico to any Circuit of the United States. The Territories of the United States, referred to in the 15th section of the act of 1891, are, in our opinion, those which it was contemplated would be assigned to some Circuit, and they do not embrace Porto Rico; and the words in the act of 1900, "in the same manner and under the same regulations and in the same cases as from the Supreme Court of a Territory of the United States," refer not to the act of 1891 but to those general statutes authorizing this court to review the final judgment of the Supreme Court of a Territory of the United States in every case, without regard to the sum or value in dispute, where the Constitution of the United States or a treaty thereof or an act of Congress is brought in question and the right claimed thereunder is denied, and in every other case where the sum or value in dispute exceeds $5000, exclusive of costs. If Congress had intended that the judgments of the United States Court for Porto Rico should, in any class of cases, be reëxamined in some Circuit Court of Appeals of the United States, it would have so declared by appropriate words. It did not so declare.

For the reasons stated, we hold that our jurisdiction to reexamine it cannot be questioned.

We come now to the merits of the case; our attention being first directed to the questions arising under the clause of the policy providing that it shall not cover "loss or damage by fire happening during the existence of any invasion, foreign enemy, rebellion, insurrection, riot, civil commotion, military or usurped power, or martial law within the country or locality in which the property insured is situated, unless proof be made to the satisfaction of the directors that such loss or damage

was not occasioned by or connected with, but occurred from
a cause or causes independent of the existence of such inva-
sion, foreign enemy, rebellión, insurrection, riot, civil commo-
tion, military or usurped power or martial law."

As the words of the policy are those of the company, they
should be taken most strongly against it, and the interpreta-
tion should be adopted which is most favorable to the insured,
if such interpretation be not inconsistent with the words used.
*National Bank* v. *Insurance Company*, 95 U. S. 673, 678, 679;
*Liverpool &c. Ins. Co.* v. *Kearney*, 180 U. S. 132, 136; *Texas &*
*Pacific Railway Co.* v. *Reiss*, 183 U. S. 621, 626. In this view
the above words should be held to mean that the policy covered
loss by fire occurring during the existence of (if not occasioned
by nor was connected with) any invasion, foreign enemy,
rebellion, insurrection, riot, civil commotion, military or
usurped power, or martial law, in the general locality where
the property insured was situated. If the loss so occurred,
then the company was entitled to demand, before being sued,
that proofs be furnished showing that the loss was not occa-
sioned by or connected with, but was from causes independent
of, such invasion, foreign enemy, rebellion, insurrection, riot,
civil commotion, military or usurped power or martial law.
But the company made no demand for proofs on this point.
On the contrary, the formal production of such proofs was, in
effect, waived; for the company assumed, that what occurred,
in the locality, at the time of the fire, constituted a riot, which
relieved it from all liability. It, therefore, gave notice by its
agents that as the fire and the destruction of the goods " were
produced by a riot they were not compelled to pay," and that
"the policy would not be paid." A general, absolute refusal
to pay in any event, or a denial by the company of all liability
under its policy, dispensed with such formal proofs as a con-
dition of its liability to be sued, and opened the way for a suit
by the assured in order that the rights of the parties could be
determined by the courts according to the facts as disclosed
by evidence. It was so held by this court in a case of fire

insurance, *Tayloe* v. *Fire Insurance Company*, 9 How. 390, 403; and the same principle was recognized as applicable in a case of life insurance. *Knickerbocker Life Insurance Co.* v. *Pendleton*, 112 U. S. 696, 709. To the same effect are authorities cited by text-writers. 2 May on Insurance (3d ed.), § 469; 2 Biddle on Insurance, § 1139; 2 Wood on Fire Insurance (2d ed.), § 445. Now, whether there was any substantial connection between the fire and military or other disturbance of the kind specified, existing in the locality where the property was situated, was a question of fact, and it was properly left to the jury. The court, referring to the above clause of the policy, charged the jury: "a fair construction of that condition, in the opinion of the court, is that in order to excuse this company from liability in case of loss of property by fire, that invasion by foreign enemy, rebellion, insurrection, riot, civil commotion, military or usurped power or martial law, must have been occurring within the section of the country where this loss occurred, or within the locality and within such radius of country where the loss occurred, that damage arose to property by reason of the existence of that rebellion, invasion, insurrection, civil commotion, military or usurped power, or martial law. And I further tell you, gentlemen, that if you believe from the evidence that this destruction of property did not occur from any of these causes, and occurred from a cause independent of the existence of any foreign enemy, rebellion, insurrection, riot, civil commotion, military or usurped power or martial law, then you should find, so far as this defence was concerned, for the plaintiff in damages whatever you think may have been his loss."

While there is some little confusion in this part of the record, we think that the trial court did not misconstrue the policy, nor commit any error upon this particular point of which the plaintiff was entitled to complain. It is to be taken that the jury found, upon the whole evidence, that the loss was occasioned by causes independent of the existence of any invasion, foreign enemy, rebellion, insurrection, riot, civil commotion,

military or usurped power, or martial law. The facts under this issue having been fairly submitted to the jury, its finding cannot be disturbed:

An important question remains to be considered. It arises out of the interest which the assured had in the property at the time of the fire. The evidence showed that the original policy was issued to Francisco Martin on the twelfth day of March, 1877, he being at that time the sole owner of the building and of the goods contained in it. The policy was renewed from year to year, the last one being dated March 12, 1898, and extending until March 12, 1899. The fire occurred in August, 1898, the assured being then alive. He did not die until October, 1899. Now, at the time of the fire, the goods insured had, by act of the assured, become, *in their entirety*, the property of Martin Brothers, a firm or society composed of two sons of the assured as active partners, and of himself as silent partner. The father turned over the business to the control and management of the two sons, and to them surrendered the custody of the goods constituting the stock in trade. At what date the sons acquired their interests in the goods and in the business does not distinctly appear. But it was before the fire; and of the change whereby the father ceased to be the sole owner of the goods described in the renewal policy and whereby also they became the property of the firm of Martin Brothers, no notice whatever was given to the company prior to the fire.

The question is whether such change in the ownership of the goods insured—no change occurring in the ownership of the building—discharged the company from all liability on the policy under that clause providing that the policy should cease "to be in force as to any property hereby insured which shall pass from the insured to any other person otherwise than by due operation of law, unless notice thereof be given to the company, and the subsistence of the insurance in favor of such other person be declared by a memorandum endorsed hereon by or on behalf of the company."

Upon the question whether an insurance policy, of the gen-

eral class to which the one in suit belongs, continues in force after a sale or transfer by the assured of his interest in the property insured, the adjudged cases are by no means in accord, and it will serve no useful purpose to make an extended review of them and show wherein they differ. It will be found upon examination that each policy contained language peculiar to itself, and upon that language the particular case turned. Of course, in every case, the fundamental inquiry must be as to the intention of the parties, to be gathered from the words of the policy; always, however, interpreting the policy most favorably for the insured, where it is reasonably susceptible of two constructions.

On the face of the policy in suit it appears that the buildings and the goods contained in them were insured separately, seven hundred pounds on the building and nine hundred pounds on the stock in trade. One construction of the policy is that if either the building *or* the stock in trade should pass from the assured to another person, then the policy should cease as to *all* the property insured. But another construction, the one most favorable to the assured, which is not unreasonable, and which is not forbidden by the words used, is that as the building and the stock in trade were separately insured the policy should cease to be in force only as to the particular property insured that passed from the assured without notice to the company. The latter is the better construction, and we hold that it is to be considered as if the building was covered by one policy and the goods by another. Whatever may have been the extent of the interest acquired by the firm of Martin Brothers in the goods, no interest in the building passed to them. The building remained, in its entirety, the sole property of the assured, up to the time of the fire, and the policy may reasonably be and therefore ought to be so construed as not to preclude a recovery in respect of its destruction by fire.

But in respect of the goods in question, the case depends upon other considerations. When the goods were insured they were in their entirety the sole property of Francisco

Martin, the assured. He was the legal owner of the whole of them. They were in his custody, and subject to his exclusive control. But at the time of their destruction by fire the ownership of the goods, in their entirety, had, by transfer from the assured, passed to Martin Brothers, and became, without notice to the company, subject to the exclusive control, in their entirety, of that firm. Such a change of ownership and control, it must be held, avoided the policy, unless it was kept alive by the mere fact that the assured although taking no active part in the business of the firm was yet a silent partner, and as such had some interest in the insured property. But that fact cannot be given the weight suggested without ignoring altogether the reasons which, it must be assumed, induced the company to incorporate into its policy the provision that if any property insured passed from the assured to another person without notice to the company, the policy should cease to be in force. It may well be that an insurance company would be willing to insure property owned by a particular person of whose character and habits its agent had knowledge or information, but unwilling to insure the same property if owned by that person in connection with others. Prudence requires that a company, before insuring against fire, should be informed as to the actual ownership of the property proposed to be insured, and know who, in virtue of such ownership, will be entitled to its custody and to control it during the term of the policy. The provision that the policy in this case should cease to be in force from the moment the insured property passed from the assured to others without notice to the company implied not only that the company relied upon the integrity and watchfulness of the assured, but that if he looked to the company for indemnity against loss by fire he must take care not to allow the property to "pass" from him to others, without notice to the insurer. The assured, without notice to the company, did pass the goods in question to a firm, each member of which thereby acquired an interest *in the whole of the goods* transferred. The ownership of the firm was in law

and in fact distinct from the original sole ownership of the assured. Practically, for all purposes of guarding the goods insured against destruction by fire, they passed to the active partners who were strangers to the property at the date of the policy—the assured, as a silent partner, retaining no interest in any particular part of the goods, and being under no obligation as between himself and the active partners, to care for the safety of the property. Its safety, after the transfer, depended altogether upon the watchfulness of the active partners in whose possession the goods were up to the fire. It only remained for the original sole owner, after passing the goods in their entirety to the firm of Martin Brothers, in which he was a silent partner, to receive such profits as accrued to him from their use in the business as conducted by the active partners.

We are of opinion that the case was not tried in accordance with a sound construction of the terms of the policy relating to the goods insured. The court proceeded upon the ground that there was no evidence of such alienation or change of ownership as avoided the policy in respect of the goods. In this error was committed, and a new trial must be had in conformity with the views we have herein expressed.

The judgment of the court below is reversed, and the cause is remanded with directions to set aside the judgment and grant a new trial.

*Reversed.*