### PRUDENTIAL INS. CO. OF AMERICA et al. v. STEWART.

(Circuit Court of Appeals, Ninth Circuit. January 8, 1923. Rehearing Denied February 19, 1923.)

#### No. 3819.

1. **Insurance ⬤⟹665(5)—Death of insured held proved.**

   Evidence *held* to sustain finding of insured's death.

2. **Insurance ⬤⟹560(1)—Failure to object to proofs of death waiver of defects of form.**

   Where the proofs of death of an insured furnished by the beneficiary were received without objection, it is a waiver by the insurer of any defects of form.

In Error to the District Court of the United States for the Southern Division of the Western District of Washington; Edward E. Cushman, Judge.

Actions at law by Maude E. Stewart against the Prudential Insurance Company of America and against the Mutual Life Insurance Company of New York. Judgments for plaintiff, and defendants bring error. Affirmed.

S. A. Keenan and Chadwick, McMicken, Ramsey & Rupp, all of Seattle, Wash., for plaintiffs in error.

H. G. Fitch, Elmer M. Hayden, Maurice A. Langhorne, and Frederic D. Metzger, all of Tacoma, Wash., for defendant in error.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

HUNT, Circuit Judge. Actions were brought to recover on certain policies of life insurance in which plaintiff below was named beneficiary. From judgments in her favor, defendants brought writs of error.

Frederick L. Stewart, the insured, was, for a long time prior to his disappearance, cashier and owner of the controlling interest in the Kelso State Bank in Washington. The institution was in a "precarious" condition much of the time Stewart was managing its affairs, and periodically the state bank officials criticized Stewart's management, and on March 6, 1921, demanded his resignation. Stewart did not resign, and on March 16, 1921, without notice to Stewart, Hay, the state bank examiner, arrived in Kelso with the intention of taking charge and closing the bank. That evening, however, a conference was held, whereat it was decided that Stewart and Hay should go to Portland, Or., the following morning and seek financial assistance from a certain person.

They went, and were refused aid, whereupon Hay returned to Kelso, and upon arrival closed the doors of the bank and began the work of liquidation. Stewart remained in Portland until 6 o'clock that evening, when he took the North Bank train for Goble. He left the train a station above Goble, and there hired a man to drive him to Goble, where he boarded the launch Queen to cross the Columbia river to the Washington side. There were five other passengers on the launch, beside two members of the crew. When the launch docked at Kalama, Stewart did not go ashore, and could not be found.

[1] Mrs. Stewart's contention is that Stewart committed suicide, while the companies argue that the evidence is insufficient to prove death. The substance of the evidence of plaintiff below is as follows:

On the night of March 16, 1921, after a protracted conference between Hay, bank examiner, Stewart, and another official of the bank; it was determined that unless immediate aid could be obtained the bank would have to be closed. Stewart was pale and under a great strain and excitement. Hay testified that he was concerned as to what Stewart might do, and therefore removed certain firearms he found in the bank. George Plamondon, assistant cashier, testified that he was present at the conference on the night of March 16th; that it lasted until 1 o'clock in the morning, and that Stewart was pretty badly shaken and worried, and had been in that condition for several days; that Stewart's account at the bank was usually overdrawn. Witness also testified regarding the use of funds in custody of the bank and of a pretended sale of a dance hall by Stewart and himself. It was stipulated that Stewart had unlawfully used funds from an estate, and that for such misconduct he could be held criminally liable under the laws of the state.

Frank Sardam testified that his family and the Stewart family were intimate friends; that he and his wife were visitors at the Stewart home for five days prior to Stewart's disappearance; that they went there at the request of Mrs. Stewart; that during those five days Stewart had spells of unusual quietness, was very nervous and pallid, and looked as if he were about to collapse; that on the night of March 17th, about 9 o'clock, Stewart telephoned from Goble and said he would be home in 40 or 45 minutes; that Stewart inquired about his wife and little son; that toward the end of the conversation his voice sounded as if he were trying to control it.

Mrs. Stewart said that about March 6th she was worried about her husband's condition; that he was a physical wreck, and that she wrote for the Sardams, her intimate friends, to come to her home, because she wanted some one there for moral support, to assist her; that Mr. Stewart was in a very nervous condition and unstrung; that he was extremely pale, ate very little, and slept little; that on the night of March 16th Stewart returned home about 1 o'clock in the morning, after the conference at the bank; that he told her he and Hay were going to Portland the following morning to see if financial assistance could be had; that Stewart did not sleep at all that night, and on the following morning took a deed from his brief case and asked her to sign it; that the deed conveyed a fourth interest in certain property to Mr. Plamondon; that before leaving the house Stewart went into the

bedroom and took their child from his bed; that he started to go out three times, but came bame back; that she never saw her husband after he left the house that morning.

The purser on the launch, who knew Mr. Stewart, testified that Stewart was on the front deck pacing back and forth; that Stewart paid his fare, and immediately thereafter stepped over some baggage and walked rapidly through the cabin, after which witness never saw Stewart again; that when the passengers were leaving the boat he missed Stewart and that the captain asked a man standing on shore if he had seen him go ashore, and upon being told that he had not, a search was instituted but Stewart was not found.

A passenger on the launch said that he recalled seeing Stewart come into the cabin, look around, and then go out to the stern of the boat; that he never saw Stewart after he went through the back door of the boat. Another witness testified that he was one of two men who went out on the stern of the boat about four minutes after Stewart went through the cabin; that Stewart was not there when they got outside; that witness asked his companion if he had seen the man who went out come back, and when his companion replied in the negative he said he had not seen him either. He stated positively that Stewart was not on deck when they went out.

The captain, who knew Stewart, said that he saw him standing in front of the pilot house on the port side in plain view; that six passengers boarded the launch at Goble, and there were two members of the crew; that the boat was in about the middle of the river when he saw Stewart go into the cabin; that in leaving the boat the passengers had to pass where he was standing, and that only five of the six left the launch that night; that he noticed Stewart's absence, and after search of the boat gave the alarm that Stewart had disappeared; that the river was 10 or 12 feet higher than normal.

The day following the trip to Portland, Mrs. Stewart received a letter from Stewart, dated March 17, 1921, telling her that he had just learned the bank was to be closed, and that he was sick and felt shaky; that, "if anything should happen" to him, she must remember that he had $86,000 life insurance, out of which he desired certain specified "debts of honor" to be taken care of, among which were various sums he had unlawfully used from the Richter estate. The letter suggested that his body be taken to California for burial, and that their young son should not go into the banking business, as it was a "lifelong worry and fight." There was also evidence that the Columbia river is deep and has a strong current, that the night was dark and stormy, that Stewart could not swim, and that not infrequently the body of one drowned in that vicinity is not recovered.

In behalf of the insurance companies a witness testified that he had seen Stewart in 1920; that on March 24, 1921, he saw Stewart in the street at Hanford, Cal.; that before he got within speaking distance Stewart stepped into a machine and drove away. This testimony was greatly weakened by evidence to the effect that at another time witness had said he had seen Stewart in Hanford on February 22, 1921. Another witness testified that he had known Stewart, and saw him in Pas-

adena, California, on April 26, 1921, but upon cross-examination this witness could not remember the first names of his own companions, or where they lived, or what hotel he stopped at in Pasadena, or what part of town the hotel was in, and admitted that he had been mistaken in identity of other persons, but said the possibility of being mistaken in this instance was slight. By deposition, the purser on the steamer Mazatlan, plying between San Francisco and Mexico, said that about April 4, 1921, a man resembling a photograph of Stewart boarded the steamer at San Pedro or Ensenada; that he talked with the man, ate at the same table with him, but did not notice anything peculiar about the man's teeth; that it took the ship about 17 days to make the trip to La Paz, Mexico.

Another witness identified the photograph of Stewart as resembling a passenger on the ship, but would not swear they were the same person. Another witness, who said he had seen Stewart in Pasadena in August, admitted that, although they were friends and passed close to each other, neither spoke. The evidence is that the reputation of the witness last referred to for truth and veracity was bad. Stewart's dentist testified that all except three of Stewart's upper teeth were gold crowned, and in the opinion of the witness it would be impossible for any one to sit at the same table with Stewart, or converse or play cards with him, and not notice his teeth.

Some evidence tending to show that it was not impossible for Stewart to have walked around the boat outside the rail without being seen, and that thus he may have escaped, was met in rebuttal by testimony of the captain and the purser of the launch, to the effect that the planking was but three inches wide, and that they had never seen any one at any time walk along the outside of the rail.

Without including more testimony, after a close consideration of the relevant facts and circumstances, we conclude that the weight of the evidence supports the inference that Stewart was drowned in the Columbia river. Conceding that the fact that Stewart was guilty of criminal conduct in connection with the affairs of the bank and the misuse of funds of an estate, and that exposure and disgrace confronted him, are grounds for an argument that, because of fear of apprehension and its consequences, he made his escape, yet, when weighed with the other evidence in this case, those very circumstances seem to point to the opposite conclusion. There is the evidence of his happy family relations, of Stewart's nervous condition before his disappearance, of the affectionate farewell letter to his wife, written before he left Portland, and the expression of his wish that his wife pay his debts of honor, and the advice as to what he wanted her to do "if anything should happen" to him, and the last communication, the telephone message inquiring about his wife and child, before he took the boat at Goble; also the circumstances that he was pacing the front deck of the boat, that he passed quickly through the cabin to the stern, and that he was not on the boat when the landing was reached. When we add to those circumstances and facts the evidence that Stewart could not swim, and that the current of the Columbia river was strong, the inference drawn by the District Court that Stewart was drowned becomes entirely rea-

sonable, and there is far from enough to enable us to say that it is not fair and proper. While, of course, there may be a possibility that the man is alive, yet, under all the evidence, we cannot avoid concurrence in the conclusion of the District Court that the testimony of identification is unsatisfactory and unreliable.

[2] In the original proofs of death, which were made out on forms furnished to the defendant in error by the Mutual Life Insurance Company, and which were forwarded April 9, 1921, the questions included in the forms appear to have been truthfully and as fully answered as circumstances called for. Of course, as the body was not found, undertaker's and coroner's certificates were not forwarded. No objections were made by the company. On April 18, 1921, proofs of death were sent to the Prudential Company, and afterwards additional affidavits, setting forth the facts and circumstances, were forwarded, and it does not appear that the company objected to the form or sufficiency. We think that, by accepting and retaining the proofs, and not requiring further information, any possible defects in respect to the forms of proofs furnished were waived. Knickerbocker Life Ins. Co. v. Pendleton, 112 U. S. 696, 709, 5 Sup. Ct. 314, 28 L. Ed. 866; Royal Insurance Co. v. Martin, 192 U. S. 149, 24 Sup. Ct. 247, 48 L. Ed. 385; Thaxton v. Metropolitan Life Ins. Co., 143 N. C. 33, 55 S. E. 419; Great American Fire Ins. Co. v. Jenkins, 11 Ga. App. 784, 76 S. E. 159.

It is unnecessary to discuss several assignments which question certain rulings upon testimony. They have been examined with care, and we cannot find that any error was committed to the prejudice of the insurance companies.

Judgments affirmed.