## THE SCHODACK.
### UNITED STATES v. AMERICAN INS. CO. OF NEWARK, N. J., et al.

District Court, S. D. New York.
June 15, 1936.

Lamar Hardy, U. S. Atty., of New York City (Charles E. Wythe, Sp. Asst. to U. S. Atty., of New York City, of counsel), for libelant.

Tompkins, Boal & Tompkins, of New York City (Arthur M. Boal, of New York City, of counsel), for respondents.

HULBERT, District Judge.

Libelant, as owner of the steamship Schodack, sues the respondents (all American insurance corporations) to recover $2,280.02 which the libelant paid pursuant to a final decree of the United States District Court of the Eastern District of New York, dated January 23, 1933, which held the steamship Schodack solely at fault for damages sustained by the steamtug Hanscom.

This case was submitted upon an agreed statement of facts, and the question presented for determination is the meaning of the word "collision" as used in a policy of marine insurance.

Libelant relies upon the fact that the Schodack had no physical contact with the Hanscom.

On June 2, 1931, the Schodack was proceeding, under her own power, into a dry-dock between Piers 2 and 3 on the west side of the Hudson River at Hoboken, N. J. She was assisted by three steamtugs, viz.: The John J. Timmins, on her port bow with a line fast thereto; the Dalzellace, with her nose against the port quarter; and the Dalzellido, with a line on the starboard quarter.

The master of the Timmins had been called to the bridge of the Schodack to act as pilot and was directing her berthing pursuant to a contract which provided that the charterer should be liable for any damages resulting therefrom. The wind and tide caused the Schodack to drift down and come in contact with the Timmins, thus forcing the latter into contact with the Hanscom, which was moored along the north side of Pier 2. No damage was sustained by the Timmins.

The question involved is in two parts: (a) Is the liability of the libelant to the owner of the Hanscom for which it seeks indemnity from respondents covered by a hull policy; and, if not, (b) whether such liability is properly within the coverage of the insurance contract here in suit.

The United States Shipping Board had maintained two self-insurance funds covering (a) hull risks, and (b) property and indemnity risks, commonly referred to as P & I insurance; discontinuing the latter it made a contract with the respondents to cover such risks under like conditions.

The pertinent provisions of the contract in suit are:

"Subject to all the limitations hereinafter stated, or agreed to by the acceptance of an application for membership or entry of any vessel in the agency, each member shall be indemnified in connection with each vessel entered against loss, damage, or expense (not being the 'ordinary losses, damages, or expenses' of the trade in which the entered vessel is employed) which the member shall become liable to pay and shall pay as the owner of an entered vessel, and which shall result from the following liabilities, risks, events, and/or occurrences.
* * *

"(5) Liability for loss of or damage to any other vessel or craft, or property on

board such other vessel or craft caused otherwise than by collision."

And further provided that: "No vessel enrolled in the Agency shall be entitled to indemnity from the Agency * * * for any liability or expense resulting from any risk, event or occurrence covered by the terms of the ordinary form of marine insurance policy on hull, machinery, etc."

It is conceded that no cause of action would exist under the English authorities, but the libelant contends that our own courts have taken a contrary view.

It is the contention of the respondents that under the provision last above quoted, the damages to the Hanscom were caused by collision and such liability is covered by the usual collision claim in a hull policy.

It is stipulated that the standard form of collision clause in hull policies in effect at that time provided: "If the Vessel hereby insured shall come into collision with any other Ship or Vessel, and the Assured or Charterers shall in consequence thereof become liable to pay, and shall pay by way of damages to any other person or persons any sum or sums in respect of such collision, we the underwriters, will pay the Assured or Charterers such proportion of such sum or sums so paid as our respective subscriptions hereto bear to the value of the Vessel hereby insured, provided always that our liability in respect of any one such collision shall not exceed our proportionate part of the value of the Vessel hereby insured * * * (provisions relating to cost of litigation and sistership provisions omitted). Provided always that this clause shall in no case extend to any sum which the Assured or Charterers may become liable to pay, or shall pay for removal of obstructions under statutory powers, for injury to harbors, wharves, piers, stages and similar structures, consequent on such collision, or in respect of the cargo or engagements of the Insured Vessel, or for loss of life or personal injury."

In Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co. (The Napoli), 263 U.S. 487, 44 S.Ct. 175, 176, 68 L.Ed. 402, Mr. Justice Holmes said: "There are special reasons for keeping in harmony with the marine insurance laws of England, the great field of this business."

The leading English case is The Niobe, decided by the House of Lords in 1891, reported as McCowan v. Baine, App.Cas. 401, also as 7 Asp.M.C.(N.S.) 89.

In that case, The Niobe, a sailing ship, was covered by a policy of insurance at and from "the Clyde (in tow) to Cardiff and/or Penarth, while there, and thence to Singapore, and while in port for thirty days after arrival."

On the voyage from The Clyde to Cardiff, the tug came in collision with, and seriously damaged, another vessel whose owner recovered damages from both The Niobe and her tug upon the theory that under such circumstances the two vessels were one and the contact was a collision under the policy.

In this case Lord Bramwell wrote a dissenting opinion which is the basis of the principal decision relied upon by the libelant. The rule established by the majority opinion in the case of The Niobe has since been followed in William France Fenwick & Co., Ltd., v. Merchants' Marine Ins. Co., Ltd., 3 K.B.(1915) 290.

In that case the Cornwood and the Rouen were steamships, both proceeding up the Seine to Rouen. The Cornwood gave a signal to pass on the portside of the Rouen, to which the latter assented and reduced her speed to three or four knots per hour. The Cornwood proceeding about ten knots per hour, drew ahead and ported across the bow of the Rouen, whose stern was attracted by the Cornwood. Seeing that a collision was inevitable, the Rouen reversed her engines and put her helm to port but not with sufficient effect to prevent a collision between the anchor on her port bow and the Cornwood's starboard quarter. The Rouen, which had been coming to port just before the collision, when disengaged from contact with the Cornwood, continued her swing to port into the middle of the stream where she struck the Galatee (a vessel coming down the river) amidships—almost at right angles. There was an action in the admiralty court which found that the Cornwood was liable for the damage to the Galatee as a result of the collision or the proximity of the Cornwood and the Rouen. The decree was successively affirmed by the Court of Appeals and the House of Lords. Action was then brought upon the policy of marine insurance (hull and machinery) under which the Cornwood was insured and recovery was had and an appeal was taken to the King's Bench. The pertinent clause of the policy in that case provided, in part: "And it is further agreed that if the ship hereby insured shall come into collision with any other ship or vessel, and the assured

shall in consequence thereof become liable to pay, and shall pay by way of damages to any other person or persons any sum or sums * * * "

Lord Reading, Chief Justice, said: "The question in this case is whether the plaintiffs have brought themselves within the words 'shall in consequence thereof'—that is, in consequence of a collision with another ship 'become liable to pay and shall pay' the damages," and held that the liability of the Cornwood to the Galatee was brought about by the collision of the Cornwood with the Rouen.

But I do not feel that I can ignore the determination of the Circuit Court of Appeals, Second Circuit, in the case of Western Transit Co. v. Brown, 161 F. 869, 870, followed by Judge Adams of this court in Coastwise Steamship Co. v. Ætna Insurance Co. (D.C.) 161 F. 871, 874.

In Western Transit Co., v. Brown, supra, in which a clause substantially the same was involved, the facts were: The tug Mariposa, with the schooner Martha in tow, coming down the starboard side of a dredged cut about 800 feet wide was met by the steamers Wilbur and Troy going up. The Wilbur suddenly sheered to port and struck and sank the Martha. In a suit by the owners of the Martha against the Wilbur and Troy, both steamers were held at fault. The court found they were going up the wrong side of the center of the cut, were racing, and that the Troy kept so close to the Wilbur that she sucked the Wilbur's stern into her own wake, and so caused the Wilbur to sheer to port, carrying her into the Martha.

While the facts are distinguishable from those in the case at bar, I feel bound by the language of the court speaking through Ward, C. J., who said:

"We entirely approve of the language of Lord Bramwell in his dissenting opinion in the case of The Niobe * * * which was a suit on this very clause:

" 'I say, then, in very fact, the Niobe did not come into collision with the Valetta, causing a liability in the appellant, and, according to the ordinary primary meaning of the words used, the case is not within them. This is agreed. But it is said that for some reason the primary and natural meaning of the words is to be extended; and that we should hold that there was a collision where there was none. I am at a loss to see why. I think an act of Parliament, an agreement, or other authoritative document ought never to be dealt with in this way, unless for a cause amounting to a necessity or approaching to it. It is to be remembered that the authors of the document could always have put in the necessary words if they had thought fit. If they did not, it was either they thought of the matter and would not, or because they did not think of the matter. In neither case ought the court to do it.

" 'In the first case, it would be to make a provision opposed to the intention of the framers of the document; in the other case, to make a provision not in the contemplation of these framers.' "

And continued: "We think the language of the clause means that the vessel of the assured shall herself come into contact with the injured vessel, and, as the Troy did not come into contact with the Martha, the decree of the court below is affirmed."

In Coastwise Steamship Co. v. Ætna Insurance Co., supra, the tow of the insured tug was in contact with and damaged a third vessel for which the tug alone was held liable. In a suit brought by the tug owner against the hull underwriters to recover indemnity under the collision clause, the court, in dismissing the libel, said: "The language of the clause in the insurance policy there [Western Transit Co. v. Brown] was substantially like that contained in the one in question here, and the decision seems determinative of the controversy, but it is proper to say that if the libellant here had desired to secure the kind of indemnity it urges it is entitled to, it could have done so by the payment of an additional premium, when a policy would have been issued to cover the loss."

It does not appear that Judge Adams considered the contention and determination in The Niobe Case, that the tug and her tow were one. It has since been held that within the meaning of the Harter Act (46 U.S. C.A. §§ 190–195) the tug and her tow is one vessel. Sacramento Nav. Co. v. Salz (The San Joaquin No. 4 Tennessee), 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663, 1927, A.M.C. 397. And equally so in a proceeding for limitation of liability, In re Hugh O'Donnell (C.C.A.2) 26 F.(2d) 334, 1928 A.M.C. 988.

To follow the construction of the hull policy as interpreted by the English authorities would seem to be a flat repudiation of the law in this district, and in consequence I am forced to determine, as a matter of consistency, that the libelant is

entitled to recovery under the P and I policy.

There is no merit in the contention of the respondents that the libelant's claim is barred for failure to present it with proper proofs of loss within the time specified in the contract.

The correspondence submitted as exhibits attached to the stipulation between the parties demonstrates that from the outset the respondents disclaimed any liability, declined to participate in the defense of the action, and refused to pay the indemnity sued for.

The repudiation of liability by the underwriters is a waiver of the requirement insisted upon. Royal Insurance Co. v. Martin, 192 U.S. 149, 24 S.Ct. 247, 48 L.Ed. 385; American Merchant Marine Ins. Co. v. Margaret M. Ford Corp. (C.C.A.) 269 F. 768; Derrick Barge Holly, 1925, A.M.C. 1569.

There will be a decree for the libelant for $2,280.02 with interest, the decree to run against the respective respondents in the proportion set forth in the contract of insurance. Settle decree on three days' notice.