**RUSSELL MINING COMPANY, Inc.**

v.

**NORTHWESTERN FIRE & MARINE INSURANCE COMPANY OF MINNEAPOLIS, MINNESOTA, a corporation.**

**No. 3485.**

United States District Court
E. D. Tennessee, S. D.
July 14, 1962.

Sam J. McAllester, Jr., of McAllester & McAllester and Clarence Kolwyck, Chattanooga, Tenn. for plaintiff.

Blake Moore, of Spears, Moore, Rebman & Williams, Chattanooga, Tenn., for defendant.

WILSON, District Judge.

This is an action by the plaintiff, Russell Mining Company, Inc., to recover upon a marine insurance policy for the loss of a barge due to sinking. The plaintiff also seeks to recover a statutory penalty from the defendant for nonpayment of insurance. From the stipulations made by the parties and the testimony of witnesses, the following are the facts of the case upon which recovery must either be granted or denied.

About June 1, 1958 the plaintiff corporation purchased a coal mining operation at Soddy, Hamilton County, Tennessee. Included in the purchase was a barge moored to the bank near Soddy Creek on Chickamauga Lake. This barge was used as a floating dock. It appears that it had formerly been an oil barge and had been purchased by the former owner and operator of the coal mining operation in 1954, at which time the barge was some 15 or 16 years of age. The former owner had installed the barge at the Soddy Creek location as a floating dock to be used by coal trucks in dumping coal onto river barges.

The subject barge was constructed of metal, was some 25 or 30 feet in width and some 150 to 175 feet in length. It was divided into compartments, and

equipped with automatic electric water pumps installed in two compartments to keep the barge pumped out. The electricity to operate the pumps was provided by wiring from the coal weighing office located upon the bank nearby.

As stated, the barge was used as a floating dock and coal trucks were driven upon it to dump coal onto other barges for transportation. It had been so used by the former owner from 1954 until 1958 and was so used by the plaintiff from the date of its purchase on June 1, 1958 until the day it sank. The sinking occurred between the hours of 6:00 p. m. on July 10 and 10:00 a. m. on July 11, 1958.

The plaintiff had insured the barge with the defendant insurance company under a marine insurance policy having a face value of $10,000. The plaintiff is here seeking to recover the face value of the policy. This policy is described as a time-hull policy and was in effect on the date the barge sank. In fact, the same insurance company had insured the barge during the approximately four years it was owned and used by the former owner, and this policy was rewritten in the name of the plaintiff at the time the plaintiff purchased it.

The circumstances surrounding the sinking of the barge are as follows. The resident manager of the plaintiff's operations at Soddy was one Lawrence Bragg. He had overall supervision of the operation, including the coal mining or stripping, the hauling of the coal to the dock and the operation of the dock. Another employee of the plaintiff, Vincent E. May, worked under Mr. Bragg and was located at the dock site where he performed the duties of a weighman and was generally in charge of the dock and the subject barge. Mr. May had performed these same duties for the former owner of the dock during the four years that he had operated it. Upon the date of July 10, 1958, another employee of the plaintiff, Jewel Withrow, a mechanic and repairman, was working at the weighing office, wiring an electric motor to a coal crusher or pulverizer used in testing the quality of the coal. In performing this work, Withrow turned off the electric current at the master switch. This also disconnected the electric current going to the automatic electric pumps on the subject barge. Withrow worked on the wiring job until about 5:30 or 6:00 p. m., when he departed for the day without turning the electricity back on. He was the last person to leave the dock area that evening, May having departed for the day around 5:00 p. m. There is evidence that Mr. Bragg, the resident manager, was working with Withrow at the weighing station during part of the day, but Withrow was the party responsible for turning off the electricity and failing to turn it back on.

Sometime during the night of July 10 or in the early morning of July 11, the barge sank. The sinking was first discovered on the morning of July 11 by May, who also discovered that the electricity to the automatic barge pumps had remained off overnight. The barge sank in about 30 feet of water and was never recovered or salvaged. An underwater inspection of the barge by a professional diver some 20 months after the sinking revealed that holes had rusted through the metal sides of the barge near the water line and plugs had been installed in the holes to reduce or prevent leaking. The holes observed by the diver varied in size from one to four inches. Some of the plugs were removed by the diver and samples of rusted metal were removed by hand from around the holes. Although, as stated, this underwater inspection was made some 20 months after the sinking, it is apparent that prior to the sinking the barge had deteriorated in the area of the normal water line and that plugs had been installed in an effort to stop or reduce the leaking.

The above statement of the facts is really not in dispute. The real dispute between the parties arises over the wording and meaning of the policy as applied to these facts. The same insurance had been in effect upon the same barge for several years and the premiums had been

paid. The problem is, what risks were intended to be insured against in return for the premiums received.

The pertinent provision of the insurance policy, after describing the insured vessel as "the steel barge called H–50" * * * "warranted confined to the use and navigation of the: moored in the Tennessee River in the vicinity of Soddy, Tennessee," was the so-called "Inchmaree" clause as follows:

> "Touching the adventures and perils which the Company is contented to bear and take upon itself, they are of the waters named herein * * *

> "This insurance also covers loss of or damage to the vessel named herein directly caused by:

> "Accidents in loading, discharging or delivering cargo, or in bunkering:

> "Accidents in going on or off, or while on dry docks, graving docks, ways, marine railways, grid irons or pontoons:

> "Breakdown of motor generators or other electrical machinery and electrical connection thereto, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull (excluding the cost and expense of replacing or repairing the defective part):

> "Contact with aircraft or with any land conveyance:

> "Negligence of charterers or repairers (other than assured in both cases) master, mariners, or pilots:

> "Provided that such loss or damage has not resulted from want of due diligence by the assured, the owners or managers of the vessel, or any of them."

It is contended by the plaintiff that the loss was occasioned by one or both of the following insured risks:

> (1) "Breakdown of motor generators or other electrical machinery and electrical connections thereto * * *"

> (2) "Negligence of charterers or repairers (other than assured in both cases) master, mariners, engineers or pilots."

Upon the other hand, it is contended by the defendant (1) that the Inchmaree clause has no application to an unmanned, moored barge on inland water; (2) that the negligence relied upon by the plaintiff was not the negligence of "charterers or repairers (other than assured in both cases) master, mariners, engineers or pilots" as those terms are used in the policy; and finally (3) that in any event the barge sank as a result of the "want of due diligence of the assured, owners or managers of the vessel, or any of them."

■ Any ambiguities in the policy must be construed against the defendant. The defendant wrote the policy and issued it knowing the nature of the insured vessel and its proposed location and use. The policy is worded in Elizabethan, if not Chaucerean, English, and is obviously designed to cover maritime risks of ships operating upon the open seas and manned by professional seamen. The policy was not drawn to insure floating barges moored upon inland creeks in the twentieth century, and yet the defendant chose to issue the policy in this form with full knowledge that it was purporting to insure an unmanned barge moored as a dock on an inland stream. The defendant chose the language used with full knowledge of its inappropriateness considering the vessel insured, its location and its moored and unmanned use. The defendant will not now be heard to say in effect that the policy is meaningless by reason of the inapplicability of ancient nautical terms to the vessel, the circumstances and the personnel involved. As stated in the case of Mattson v. Connecticut Fire Insurance Co., D.C., 80 F.Supp. 101:

> "The words of that policy are the words of the insurer; hence they are construed most strongly against the insurer, and most favorable to the

insured. Royal Insurance Co. v. Martin, 192 U.S. 149, 24 S.Ct. 247, 48 L.Ed. 385."

It is the opinion of the Court that while the general condition of the barge, due to its age and its rusting and deterioration of the hull, caused the barge to leak, the direct and immediate cause of the sinking was the negligence of Withrow in cutting off the electricity to the pumps and leaving it off overnight. The testimony indicates that all barges, particularly those with any age upon them, leak and require pumping to keep them afloat. It was or should have been known to the insurance company that pumps were needed and had in fact been used to keep the barge afloat throughout the period of some four years that the barge had been insured. With the pumps properly operating it appears that the barge had remained afloat and useable, or was "seaworthy" for the purposes it was used and in the location where it was used, even though the hull may have been leaking from age and deterioration. That the barge might some day have sunk from leaks due to deterioration in the hull, in spite of the pumps, is not the issue. The fact is that it sank upon this date as a direct and proximate result of the pumps being turned off through the negligence of Withrow.

The question therefore is whether the negligence of Withrow in causing the barge to sink is an insured risk. The Court is of the opinion that it is. Under all of the circumstances of the case it is the opinion of the Court that his negligence would be that of a "repairer" as that term is used in describing an insured risk under the policy.

Moreover, the Court is of the opinion that the failure of the electric pumps under the circumstances of this case would constitute a "breakdown of motor generators or other electrical machinery and electrical connections thereto" as those terms are used in the policy in describing an insured risk.

The defendant contends that the sinking of the barge was caused by the negligence of May in not discovering the deteriorated and leaking condition of the barge and remedying it, in failing to check to see that the electricity was turned on before he departed, and in failing to check the barge before retiring at night, and that May was a "manager" as that term is used in the policy, so as to impute his negligence to the owners or assured. The failure of May to check the barge before retiring at night, while it may have been a dereliction of his duties as assigned by his employer, would not constitute such a failure to use ordinary care as would amount to negligence upon his part. Nor in the opinion of the Court were any of the management personnel of the plaintiff corporation guilty of such a want of due diligence as would relieve the defendant of its obligations under the policy.

Moreover, even if May were guilty of negligence and that negligence were imputed to the owner, or even if other management personnel were guilty of a want of due diligence, the Court is of the opinion that this was at most a remote cause of the loss, and not an immediate cause of the barge having sunk. Such a remote cause would not bar recovery under the policy. As stated in 45 C.J.S. Insurance § 870:

"On the other hand, unless the policy expressly so provides, negligence ordinarily will not defeat recovery under a policy. Hence where the immediate cause of a loss is a peril insured against, and the master, crew and equipment are competent and sufficient at the commencement of the voyage, the underwriters are liable notwithstanding a contributing or remote cause of the loss is the negligence of the insured, or that of the master, crew, or other agents or servants, or notwithstanding the accident would not have occurred but for the negligence of the master, crew, or other agents or servants."

See also Couch, Cyclopedia of Insurance Law, Vol. 6, sec. 1490:

> "In view of the fact that the object of insurance is to grant indemnity against certain perils the risk of which the insurer assumes, and that the proximate cause of loss, rather than the remote cause, is to be considered, it has become well settled marine insurance law that where the policy does not provide otherwise, if the proximate cause of the loss is a peril insured against, the fact that the loss is remotely ascribable to the negligence of the master or mariners of the vessel, or of their other officers or employees * * * constitutes no defense to the underwriter * * *"

Moreover, even if May were conceded to have been negligent, neither the negligence of May nor of Withrow would be imputed to the plaintiff so as to constitute a "want of due diligence by the assured, the owners or managers of the vessel, or any of them," as those terms are used in the policy. It is well settled in marine insurance law that negligence of agents or servants below the level of management will not be imputed in the usual manner. Saskatchewan Government Insurance Office v. Spot Pack, Inc., 5 Cir., 242 F.2d 385. Neither May nor Withrow could be considered as holding positions of management with the plaintiff. May was merely a weighman and dock operator. Withrow was merely a mechanic and handyman. As stated in Appleman, Insurance Law and Practice, Vol. 4, sec. 2689, 1961 Supplement:

> "The inchmaree clause of a time-hull policy qualifies a ship owner's implied warranty of seaworthiness by reducing the scope of warranties if such unseaworthiness arises from the negligence of the master, mariners, engineers or pilots and negligence of agents below the level of management could not be imputed on the usual motions of respondeat superior."

Turning now to the plaintiff's request for recovery of a statutory penalty for failure of the defendant to pay this claim, the Court is of the opinion that there is no showing of such circumstances as would warrant the imposition of a penalty upon the defendant. The refusal of the defendant to pay appears to have been in good faith and upon the reasonable belief that it was not obligated to pay under the provisions of the policy. The defendant's request for a statutory penalty will therefore be denied.

This Opinion will constitute the findings of fact and conclusions of law in the case. An order will enter accordingly.